UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


NATIONAL FIRE PROTECTION        )
ASSOCIATION, INC.,              )
    Plaintiff,                  )
                         )      CIVIL ACTION NO.
           v.                   )      03-10848-DPW
                         )
INTERNATIONAL CODE COUNCIL,     )
INC., BUILDING OFFICIALS AND    )
CODE ADMINISTRATORS             )
INTERNATIONAL, INC.,            )
INTERNATIONAL CONFERENCE OF     )
BUILDING OFFICIALS, and         )
SOUTHERN BUILDING CODE          )
CONGRESS INTERNATIONAL, INC., )
    Defendants.                 )


MEMORANDUM AND ORDER
March 29, 2006

The plaintiff and counterclaim defendant, National Fire

Protection Association, Inc. (the "Plaintiff") and the defendants

and counterclaim plaintiffs, International Code Council, Inc.,

Building Code Officials and Code Administrators International,

Inc., International Conference of Building Officials, and

Southern Building Code Congress International, Inc.

(collectively, "ICC" or the "Defendant"), have both moved for

partial summary judgment to resolve liability with respect to

certain of the claims and counterclaims raised in their ongoing

dispute over ICC's commercial use of the marks INTERNATIONAL

ELECTRICAL CODE, INTERNATIONAL CODE COUNCIL ELECTRICAL CODE, and

ICC ELECTRICAL CODE.

Specifically, the following liability issues have been raised in summary judgment motions: (1) whether ICC's admitted commercial use of the marks in question infringed NFPA's registered trademark ("INTERNATIONAL ELECTRICAL CODE®"); (2) whether the same alleged commercial use breached the parties' 1999 Settlement Agreement and Mutual Release ("Settlement Agreement"); (3) whether NFPA breached the parties' Settlement Agreement by asserting claims against ICC arising from ICC's commercial use of the mark INTERNATIONAL CODE COUNCIL ELECTRICAL CODE; and (4) whether NFPA's claim against ICC for violating Mass. Gen. L. ch. 93A fails for lack of a sufficient nexus with Massachusetts.

After a hearing was held on these liability motions, ICC moved for partial summary judgment on the issues of damages and unjust enrichment, seeking an order declaring that NFPA has not suffered any actual damages and that ICC has not been unjustly enriched by using any of the marks in question.  I consider and resolve the several motions for partial summary judgment together.

## I. BACKGROUND

**A.   Facts**

<u>1. The Parties</u>

The Plaintiff, **National Fire Protection Association, Inc. ("NFPA")**, describes itself as "an international, nonprofit,

membership organization founded in 1896" whose mission is to develop "scientifically based consensus codes and standards" and provide "research, training, and education... to reduce the worldwide burden of fire and other hazards."  NFPA's most successful and widely-distributed publication is the NATIONAL ELECTRICAL CODE®,[1] also known as the NEC®.  This 720-page publication establishes technical requirements for the design and installation of electrical wiring systems.  The NEC® has been adopted in whole or in part in various jurisdictions throughout the United States, as well as in Puerto Rico, Mexico, Venezuela, Columbia, Costa Rica and Panama.  The NFPA added "administrative provisions" to the NEC® in the 2002 edition.

In October 1997, NFPA began using the INTERNATIONAL ELECTRICAL CODE® mark on the 1996 edition of its Spanish version of the NEC®, Código Eléctrico Nacional, and on other products it wished to identify as part of the INTERNATIONAL ELECTRICAL CODE® series.[2]  The NEC® remains the anchor of the INTERNATIONAL

---

[1] NFPA is the owner of the registered trademarks NATIONAL ELECTRICAL CODE® (reg. number 1094460) and NEC® (reg. number 1165496).

[2] The INTERNATIONAL ELECTRICAL CODE® series includes the, NEC® (1999, 2002, 2005), Código Eléctrico Nacional (1996, 1999), NEC Handbook (1999, 2002), NEC Changes (1999), NFPA 70 – NEC Requirements for One- and Two-Family Dwellings, Electrical Inspection Manual (editions based on the 1999 NEC and 2002 NEC), Pocket Guide to Residential Electrical Inspections, User's Guide to the National Electrical Code, NFPA's Electrical References, two-volume Pocket Guide to Electrical Installations Under the NEC (2002, 2005), NEC Expert (1999, 2002), Manual Del Código Eléctrico Nacional, Manual De Inspección Eléctrica NFPA, and NEC

ELECTRICAL CODE® product line series.  NFPA has sold over 2.75 million copies of publications bearing the mark "INTERNATIONAL ELECTRICAL CODE®.  The suggested retail price for the NEC® is $65, but the actual retail price varies according to the year of the edition, style of edition and the identity of the purchaser. The prices of the other products within the INTERNATIONAL ELECTRICAL CODE® series vary with some being sold for less than $25.

The Defendant, **The International Code Council, Inc. ("ICC")**[3], describes itself as a "non-profit organization whose principal activities consist of developing and publishing national model codes which are used by states, municipalities, architects, engineers, designers, contractors, and others." According to the ICC,  "[t]hese codes seek to protect the public health, safety, and welfare by providing ... model standards for consideration and adoption by governmental entities and for use by various professionals and others in the building industry." ICC was formed in 1994 to facilitate cooperation among three existing national code writing organizations:  Building Officials and Code Administrators, Inc., the International Conference of Building Officials, and the Southern Building Code Congress

---

Guide to the Major Changes video.

[3] The ICC owns the registered trademark INTERNATIONAL CODE COUNCIL trademark (reg. number 2242343).

International, Inc.[4]  ICC develops and sells a collection of model code documents, collectively marketed as "International Codes."  These publications include the International Building Code, International Fire Code, International Fuel Gas Code, International Mechanical Code, and what is now called the International Code Council Electrical Code.

2. The First Dispute Over the INTERNATIONAL ELECTRICAL CODE mark

In January 1996, NFPA filed an application with the United States Patent and Trademark Office ("PTO") to register the mark "INTERNATIONAL ELECTRICAL CODE."  In July 1996, ICC filed its own application with the PTO to register the mark "INTERNATIONAL ELECTRICAL CODE."  On June 9, 1997, ICC filed an Opposition to NFPA's application.

In 1997, NFPA began publishing works under the mark INTERNATIONAL ELECTRICAL CODE SERIES® and in 1999 ICC published a new document for its International Code series entitled INTERNATIONAL ELECTRICAL CODE.

On March 24, 1999, ICC filed a lawsuit styled *International Code Council, Inc. v. National Fire Protection Association, Inc.*, (Civil Action No. 99-395-A, E.D. Va.) against NFPA for infringement and false designation of origin with respect to the "INTERNATIONAL ELECTRICAL CODE" mark (the "1999 Lawsuit").  NFPA

---

[4] In 2003, the three groups formally combined into a single entity, ICC.

filed a counterclaim against ICC for infringement and false designation of origin, among other claims, with respect to the same mark.

3. The Settlement Agreement

On December 1, 1999, NFPA and the ICC parties executed a Settlement Agreement and Mutual Release resolving that NFPA would be the exclusive owner of the trademark INTERNATIONAL ELECTRICAL CODE.  The provisions of the Settlement Agreement are discussed as relevant later in this Memorandum.  At this stage I observe simply that ICC also agreed to destroy all of its publications bearing the mark INTERNATIONAL ELECTRICAL CODE, which it has done.  The PTO subsequently granted NFPA's trademark application for the mark INTERNATIONAL ELECTRICAL CODE®, which was registered as number 2427178 on February 6, 2001.

4. The Instant Dispute

In the instant case, the parties revisit issues involving the INTERNATIONAL ELECTRICAL CODE trademark because, after the execution of the Settlement Agreement, ICC renamed and published its 1999 INTERNATIONAL ELECTRICAL CODE as the "ICC Electrical Code Administrative Provisions"[5] in 2000 and the "INTERNATIONAL CODE COUNCIL ELECTRICAL CODE Administrative Provisions" in 2003

---

[5] On November 24, 1999, prior to the execution of the Settlement, ICC submitted an application to the PTO to register the trademark ICC ELECTRICAL CODE.  NFPA was not aware of the application and did not oppose it.  The PTO granted ICC's trademark application for ICC ELECTRICAL CODE, and the mark was registered as reg. number 2586007 on June 25, 2002.

(collectively, "Administrative Provisions").  NFPA seeks relief from this activity; ICC counterclaims that by initiating this litigation NFPA breached the Settlement Agreement.

ICC's Administrative Provisions can be used to implement the NEC®.  Advertisements for the Administrative Provisions make direct reference to the NATIONAL ELECTRICAL CODE®, characterizing ICC's publications as a "comprehensive and necessary set of regulations for administering and enforcing the NFPA's NATIONAL ELECTRICAL CODE®," a characterization that NFPA objects to.  The ICC publications, which are approximately 25 pages in length excluding the prefaces, have a suggested retail price of $7.00 - $9.00, but have been advertised at a higher price.

NFPA alleges that ICC's Administrative Provisions, even though renamed, still infringe its trademark and breach the Settlement Agreement.  As a result, NFPA seeks relief in this lawsuit from ICC's alleged unauthorized commercial use of the marks INTERNATIONAL CODE COUNCIL ELECTRICAL CODE and ICC ELECTRICAL CODE.  NFPA also seeks relief against ICC for its admitted unauthorized commercial use of the registered mark INTERNATIONAL ELECTRICAL CODE to refer to its Administrative Provisions.  Specifically, ICC admits that its e-commerce website made a reference to the "2003 International Electrical Code" alongside a picture of its INTERNATIONAL CODE COUNCIL ELECTRICAL CODE Administrative Provisions publication; that its March 2004 edition of its monthly "Building Safety Bulletin" listed the ICC

publication as the "2000 ICC International Electrical Code Administrative Provisions"; and that its online Membership Application listed the ICC publication as the "2003 International Electrical Code® Administrative Provisions."  ICC characterizes these uses as "inadvertent" and occurring only "in a few isolated instances."

The parties have submitted numerous affidavits and statements of fact in support of their respective positions. NFPA's submissions purport to establish confusion in a certain segment of the public about the relationship between NFPA and ICC's publications through the following factual proffers:

- NFPA's expert Brooke Stauffer, in his role as Executive Director of Standards and Safety for the National Electrical Contractors Association, has observed many instances where the mark INTERNATIONAL ELECTRICAL CODE has been used by third parties to refer to the ICC ELECTRICAL CODE Administrative Provisions.

- Stauffer has personally communicated with electricians and other contractors who have called him to ask technical questions about the "International Electrical Code" and its relationship with NEC®.  The callers believed that "International Electrical Code" referred to the ICC ELECTRICAL CODE Administrative Provisions.  The callers also made "general inquiries along the lines of 'what is this International Electrical Code anyway? Is it part of the NEC?' or 'what is this International Electrical Code? Does it replace the NEC?'; or 'I've already got a code book in my trunk.  Do I have to pay attention to this International Electrical Code now?"

- INTERNATIONAL ELECTRICAL CODE constituted the ninth-most common entry of all search terms entered on the ICC website http://www.iccsafe.org for the week ending August 9, 2003.[6]

---

[6] ICC notes that the parties were in litigation by August 9, 2003 so these searches likely include searches by the parties.

- A third party e-mailed the ICC on April 24, 2002 to inquire about the availability of a book or publication on the International Electrical Codes.

- A website for electrical contractors featured an online discussion forum wherein the moderator and members discussed a proposed bill to remove the NFPA's NATIONAL ELECTRICAL CODE® as Florida's electrical code and replace it with the "INTERNATIONAL ELECTRICAL CODE." One posting stated: "The more I read the Bill, the more I am starting to wonder if the Florida Building Commission actually thinks the IEC is an actual electrical code and not just an Administrative Code." Another subsequent posting noted that the "ICC IEC has been removed from the Bill and the NFPA codes as normally adopted, ..., have been added back in.  The NFPA codes were omitted by mistake."[7]

- ICC's third party distributors have used NFPA's trademark "INTERNATIONAL ELECTRICAL CODE" in advertising and selling ICC's Administrative Provisions.  NFPA produced printouts of 11 distributor websites that used NFPA's mark. (Pl. Facts I (Spring 2005), ¶¶ 68-69; Cote Aff. Ex. P).

- Certain governmental entities and industry groups have erroneously referred to the ICC Administrative Provisions as the "International Electrical Code."  For example:

  - The Town of Hilton Head Island's website stated that

---

[7] ICC objects, based on hearsay and authentication grounds, to these statements and the other online documents attached to the Cote Affidavit as Exhibits.  NFPA correctly points out that these documents are not hearsay to the degree they are being proffered as examples of actual confusion and not to prove the truth of the matter asserted therein.  [NFPA Reply Brief, fn. 13 (citing Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 31 (1st Cir. 1989).]  See Fed. R. Evid. 801(c).  I find, however, that Exhibit M of the Cote Affidavit cannot be used as evidence that "the Florida Building Commission actually thinks the IEC is an actual electrical code and not just an Administrative Code."
I note more generally that the parties have filed a Joint Stipulation Regarding Authentication Issues on Summary Judgment waiving objections that an affiant or other witness propounding documents is not the appropriate person through which to authenticate such documents, but this stipulation does not resolve totem pole hearsay issues such as the view being ascribed to the Florida Building Commission.

the IEC (defined as International Electrical Code) 2002 is its current code;

- The Denver website stated that it "recently changed to the series of International Codes developed by the International Code Council, the ICC.  These include the 2003 Series of I Codes and accompanying National Electrical Code regulated by the National Fire Protection Association and the State of Colorado Electrical board."

- The City of Philadelphia City Council stated that it was "adopting and incorporating, with certain additions, deletions and amendments, the 2003 International Electrical Code Administrative Provisions as the Philadelphia Electrical Code."

- The City of Coatesville, PA Codes Department website includes International Electrical Code 2000, edition 1 and the NFPA Electrical Code in its list of Current Codes Being Used.

- The Rock Island Illinois website includes 2002 National Electrical Code and 2003 International Electrical Code Administrative Procedures in its list of Current Codes Being Used.

## B.   Procedural History

NFPA filed the Complaint commencing this action on May 6, 2003 asserting eight counts: Trademark Infringement (Count I); False Designation of Origin (Count II); Declaratory Judgment (Count III), Breach of Contract (Count IV); Breach of the Covenant of Good Faith and Fair Dealing (Count V); Common Law Unfair Competition (Count VI); Unjust Enrichment (Count VII); and Violation of Mass. Gen. L. ch. 93A (Count VIII).

ICC filed an Answer and Counterclaim, followed by an Amended Answer and Counterclaim with leave.  ICC's first counterclaim, which is not at issue in the present motions, relates to NFPA's

allegedly wrongful use of ICC's federally-registered trademark "Building a Safer World."  The second counterclaim asserts that NFPA breached the Settlement Agreement by undertaking the present litigation against ICC for its use of INTERNATIONAL CODE COUNSEL ELECTRICAL CODE.

On February 11, 2004, NFPA filed a Motion for Judgment on the Pleadings, or in the Alternative, Motion for Summary Judgment as to ICC's Counterclaim.  On March 24, 2004, NFPA also filed a Motion for Partial Summary Judgment as to Counts I, III, and IV of the Complaint.  I denied both motions on March 25, 2004 without prejudice to renewal in accordance with an amended Scheduling Order.  Pursuant to that Order, NFPA filed a Renewed Motion for Partial Summary Judgment as to Counts I, III, and IV of the Complaint on April 1, 2005 requesting entry of "partial summary judgment as to the NFPA's Count I (Trademark Infringement), Count III (Declaratory Judgment), and Count IV (Breach of Contract) of the Complaint as to [ICC's] use of the mark 'INTERNATIONAL ELECTRICAL CODE.'"

For its part, ICC filed a Motion for Partial Summary Judgment on April 1, 2005 requesting entry of judgment against Plaintiff and Counterclaim Defendant NFPA on ICC's counterclaim for breach of the Settlement Agreement (Second Counterclaim); all of NFPA's claims related to ICC's use of the marks "INTERNATIONAL CODE COUNCIL ELECTRICAL CODE" and "ICC ELECTRICAL CODE"; and on NFPA's Chapter 93A claim.

-11-

After a hearing was held on these liability motions on September 21, 2005, ICC moved on December 1, 2005 for partial summary judgment on the issue of damages and unjust enrichment. By that motion, ICC seeks a declaration that NFPA has not suffered any actual damages and that ICC has not been unjustly enriched by the alleged breach of contract and trademark infringement.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment must make a preliminary showing that no genuine issue of material fact exists. Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995), cert. denied, 515 U.S. 1103 (1995). Once the movant makes such a showing, the nonmovant must point to specific facts demonstrating that there is, indeed, a trialworthy issue. Id.

A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000), and a "genuine" issue is one supported by such evidence that "a 'reasonable jury, drawing favorable inferences,' could resolve it

in favor of the nonmoving party."  Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (quoting Smith v. F.W. Morse & Co., 76 F.3d 413, 428 (1st Cir. 1996)). "[C]onclusory allegations, improbable inferences, and unsupported speculation," are insufficient to establish a genuine dispute of fact.  Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).  "While infringement and unfair competition cases often present factual issues that render summary judgment inappropriate, this is not invariably so." Kazmaier v. Wooten, 761 F.2d 46, 48-49 (1st Cir. 1985).

Cross-motions for summary judgment do not alter the basic summary judgment standard, but rather require courts to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. See Adria Int'l Group, Inc. v. Ferre Dev., Inc., 241 F.3d 103 (1st Cir. 2001); Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996). Thus, in deciding cross-motions for summary judgment, courts must consider each motion separately, drawing all reasonable inferences against each movant in turn.  Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997).

## II. DISCUSSION

**A. Mass. Gen. Laws ch. 93A (Count VIII)**

I begin with the least complicated issue.  ICC seeks entry of summary judgment against NFPA on its Mass. Gen. Laws ch. 93A

claim because there is no evidence that ICC's actions "occurred primarily and substantially within the Commonwealth" of Massachusetts as required by ch. 93A, § 11, which provides:

> No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth. For the purposes of this paragraph, the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth.

To determine whether the circumstances that gave rise to a claim occurred "primarily and substantially" in Massachusetts, Massachusetts courts examine the "center of gravity" of the allegedly unfair and deceptive conduct. Uncle Henry's, Inc. v. Plaut Consulting Co., Inc., 399 F.3d 33, 44 (1st Cir. 2005) citing Kuwaiti Danish Computer Co. v. Digital Equipment Corp., 438 Mass. 459, 473 (2003).  The Supreme Judicial Court has disavowed the use of any particular set of factors in determining whether alleged wrongful conduct occurred 'primarily and substantially' in Massachusetts.  Uncle Henry's, 399 F.3d at 44.

In this case, NFPA asserts that its "[ch.] 93A claim centers on the fact that ICC negotiated and entered into a contract with NFPA," a Massachusetts-based company whose operations are centered in Massachusetts, "that it had no intention of upholding....  [Furthermore, ICC] set about on a course of conduct designed to cause confusion in the marketplace through

-14-

the repeated use of its confusing marks, as well as NFPA's International Electrical Code® mark."

ICC notes the following facts to support its argument that the "center of gravity" of the allegedly unfair and deceptive conduct occurred outside Massachusetts:  ICC does not maintain offices in Massachusetts; ICC negotiated the Settlement Agreement from outside Massachusetts; ICC chose new names for its Administrative Provisions in offices outside Massachusetts; ICC filed a trademark application for the ICC ELECTRICAL CODE with the PTO, which is located outside Massachusetts; ICC's Administrative Provisions were not printed in Massachusetts; ICC did not ship the publications from Massachusetts; ICC did not target its advertising in Massachusetts; and only 1.26% of ICC's sales of the subject publications were derived from Massachusetts' customers.

NFPA responds that the work done <u>by NFPA</u> in "analyzing and negotiating the Agreement occurred in Massachusetts" and that it received "deceptive communications" from ICC in Massachusetts resulting in a form of fraud in the inducement to enter into the Settlement Agreement.  However, as ICC noted in its Reply Brief, NFPA has not identified any particular "deceptive communications" that ICC directed to it in Massachusetts.  Moreover, I observe that NFPA does not seek to void the Settlement Agreement it argues it was fraudulently induced to execute, but rather seeks to enforce it.

-15-

Under the circumstances, I find, as a matter of law, that the actions and transactions constituting the alleged unfair methods of competition or the unfair or deceptive acts or practices, namely the use of NFPA's marks and the registration and use of marks allegedly confusingly similar to NFPA's marks, did not occur primarily and substantially within Massachusetts. Accordingly, I will grant summary judgment to ICC on Count VIII.

**B. ICC's use of INTERNATIONAL ELECTRICAL CODE**

NFPA alleges broadly that ICC's unauthorized use of its mark INTERNATIONAL ELECTRICAL CODE after the Settlement Agreement breaches that agreement (Count IV) and the related covenant of good faith and fair dealing (Count V).  In addition, NFPA alleges that this use infringes its registered trademark (Count I) and amounts to false designation of origin (Count II), pursuant to § 32 and § 43(a)(1) of the Lanham Act, respectively, and that the use amounts to unfair competition (Count VI) under Massachusetts common law.  As separate causes of action and grounds of relief, NFPA also requests a declaratory judgment that ICC has no right to use the mark INTERNATIONAL ELECTRICAL CODE (Count III) and relief from ICC's unjust enrichment (Count VII).

In its renewed motion, NFPA seeks partial summary judgment only as to ICC's liability for use of the mark INTERNATIONAL ELECTRICAL CODE and as to that use only under Counts I (Trademark Infringement), III (Declaratory Judgment), and IV (Breach of

Contract).  ICC has opposed this motion, but did not file its own motion for summary judgment as to its liability for using NFPA's mark INTERNATIONAL ELECTRICAL CODE.  ICC has, however, filed a motion for partial summary judgment on the issues of damages and unjust enrichment, seeking an order that NFPA did not suffer any damages and that ICC was not unjustly enrichment by its use of NFPA's mark INTERNATIONAL ELECTRICAL CODE or, for that matter, its use of ICC ELECTRICAL CODE and INTERNATIONAL CODE COUNCIL ELECTRICAL CODE.  Before considering the damages issue, I will fist conduct my analysis of the liability issue with respect to ICC's use of INTERNATIONAL ELECTRICAL CODE.

## 1. Breach of Contract (Count IV)

NFPA alleges that ICC breached the 1999 Settlement Agreement by using INTERNATIONAL ELECTRICAL CODE on its website and in certain materials.  This use was in direct contravention of ¶ A-3 of the Settlement Agreement which provides that ICC will not use the trademark INTERNATIONAL ELECTRICAL CODE, except in reference to the goods or services of NFPA.  Paragraph G-6 specifically contemplates NFPA bringing an action in this Court to enforce this provision.  ICC does not deny that it used NFPA's mark in violation of the Settlement Agreement, although it claims to have done so inadvertently.  Rather, ICC opposes summary judgment as to this count because NFPA cannot demonstrate that it was ready, willing, and able to perform its end of the bargain at the time of ICC's alleged breach.  I find this anticipatory breach defense

unavailing.

ICC relies upon the general rule "'that when performance under a contract is concurrent, one party cannot put the other in default unless he is ready, able, and willing to perform and has manifested this by some offer of performance' although a tender of performance is not necessary 'if the other party has shown that he cannot or will not perform.'" Frostar Corp. v. Malloy, 63 Mass.App.Ct. 96, 106 (Mass. App. Ct. 2005) citing Kanavos v. Hancock Bank & Trust Co., 395 Mass. 199, 202 (1985)(quoting Mayer v. Boston Metropolitan Airport, Inc., 355 Mass. 344, 354 (1969)). But ICC does not offer any factual support for its claim that NFPA was not "ready, able, and willing to perform" its part of the bargain when ICC allegedly inadvertently began using NFPA's mark, other than the fact that NFPA brought the instant suit four years after executing the Settlement Agreement.  To the contrary, it is undisputed that NFPA has refrained from using any ICC Marks itself and that NFPA has filed Consents and withdrawn oppositions as required by the Settlement Agreement.  Consequently, I will grant summary judgment to NFPA as to liability on its breach of contract claim related to ICC's admitted use of INTERNATIONAL ELECTRICAL CODE after the execution of the Settlement Agreement.

2. Trademark Infringement (Count I)

NFPA pursues its trademark infringement claim under the authority § 32 of the Lanham Act, which provides:

Any  person  who  shall,  without  the  consent  of  the

-18-

> registrant -- (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1)(a).  "To win a trademark case, a plaintiff must show 1) that he uses, and thereby 'owns,' a mark, 2) that the defendant is using that same or a similar mark, and 3) that the defendant's use is likely to confuse the public, thereby harming the plaintiff."  DeCosta v. Viacom International, Inc., 981 F.2d 602, 605 (1st Cir. 1992) (citations omitted).

ICC does not dispute that NFPA uses and owns its INTERNATIONAL ELECTRICAL CODE mark.  Similarly, ICC admits that it used NFPA's mark commercially after NFPA registered the trademark in 2001.[8]  As a result, the trademark infringement claim turns on the "likelihood of confusion" requirement, which is "[t]he key element in any infringement action."  Purolator, Inc. v. EFRA Distributors, Inc., 687 F.2d 554, 561 (1st Cir. 1982).

---

[8] Specifically, ICC admits that its e-commerce website made a reference to the "2003 International Electrical Code" alongside a picture of its INTERNATIONAL CODE COUNCIL ELECTRICAL CODE Administrative Provisions publication; that its March 2004 edition of its monthly "Building Safety Bulletin" listed the ICC publication as the "2000 ICC International Electrical Code Administrative Provisions"; and that its online Membership Application listed the ICC publication as the "2003 International Electrical Code® Administrative Provisions."

The First Circuit has "identified eight factors to be weighed in determining likelihood of confusion."  I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 43 (1st Cir. 1998) citing Pignons S.A. de Mechanique de Precision v. Polaroid Corp., 657 F.2d 482, 487 (1st Cir. 1981).  They are:

> (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark.

I.P. Lund, 163 F.3d at 43.  "No one factor is necessarily determinative, but each must be considered.  The factors are non-exclusive, however, and are not always apt to the particular facts of a case."  Id. (citations omitted).  "Courts may consider other factors and may accord little weight to factors that are not helpful on the particular facts of a case." Beacon Mutual Insurance Co. v. OneBeacon Insurance Group, 376 F.3d 8, 15 (1st Cir. 2004).  I consider each factor in turn.

a. Similarity of the Marks: ICC's use of the mark INTERNATIONAL ELECTRICAL CODE in reference to its publications involves the use of identical words, so this factor plainly favors NFPA.

b. Similarity of the Goods:  The parties agree that the goods to be compared here are ICC's two Administrative Provisions and NFPA's INTERNATIONAL ELECTRICAL CODE® series.  I find that

these goods are substantially similar and overlapping, despite the fact that ICC's publications do not constitute a complete electrical code like the NEC®, the anchor publication for NFPA's INTERNATIONAL ELECTRICAL CODE® series.  As ICC conceded in its Answer to NFPA's counterclaims in the 1999 Lawsuit between the parties, the disputed marks are "in connection with goods that are related and, in point, similar to NFPA's National Electrical Code."

ICC markets its publications as "administrative provisions for implementing the NEC" and "necessary to administer and enforce" NFPA's NATIONAL ELECTRICAL CODE®.  ICC's publications are also shorter and less costly than the NEC®.  Nevertheless, ICC's publications include at least limited provisions that address the same topics.  According to NFPA's expert, Chapter 12 of ICC's Administrative Provisions contains wiring rules on some of the same subjects covered by the NEC® and Annex G of the 2005 NEC® and Article 80 of the 2002 NEC® contain administrative provisions similar to ICC's publications.  And, although ICC's publications may have been, as plaintiff's expert Beutel explains, "primarily designed to be a complement to the NFPA's NATIONAL ELECTRICAL CODE®, rather than a substitute for it[,] ... [they] contain[] substantive provisions that are intended to replace various portions of NFPA's NEC®."  In addition, both sets of publications profess to include model electrical codes

available for adoption by local or state governments.[9]  Thus, I find that ICC's Administrative Provisions and NFPA's INTERNATIONAL ELECTRICAL CODE® series are substantially similar and this factor also favors NFPA.

c. Channels of Trade; Advertising; Classes of Prospective Purchasers:[10]  I find that the relationship between the parties' channels of trade and their advertising and the classes of prospective purchasers all favor NFPA.

ICC admits that "ICC and NFPA sell their products through the same channels of trade and advertising and to the same customers, but ICC also points out that defendants in trademark infringement cases have prevailed even when these factors favor the plaintiff.  See, e.g., Pump, Inc. v. Collins Management, Inc., 746 F.Supp. 1159, 1168-69 (D. Mass. 1990), CCBN.com, Inc. v. c-call.com, Inc., 73 F.Supp.2d 106, 112-13 (D. Mass. 1999), and HQ Network Systems v. Executive Headquarters, 755 F.Supp. 1118 (D.Mass. 1991).

With respect to the similarity between the classes of

---

[9]  The prefaces of the ICC's publications describe themselves as "model code regulations... available for adoption and use by jurisdictions internationally."  NFPA has consistently described its "anchor publication" as a "model electrical code" available to be "adopted as the standard electrical code at the state, county, or local level."

[10] Both parties considered the next three factors together since "the overlap between the parties' trade channels, advertisers, and markets are three factors conventionally analyzed together." Copy Cop, Inc. v. Task Printing, Inc., 908 F.Supp. 37, 45 (D.Mass. 1995).

prospective purchaser factors, ICC cites International Ass'n of

Machinists and Aerospace Workers v. Winship Green Nursing Center,

103 F.3d 196, 204 (1st Cir. 1996) for the proposition that:

> the requisite inquiry is not limited merely to
> determining whether the class of prospective purchasers
> is the same or different.  Instead, a court called upon
> to assay likelihood of confusion must ponder the
> sophistication of the class, thereby taking account of
> the context in which the alleged infringer uses the mark.

In this connection, ICC points to admissions made by NFPA that

the purchasers of NFPA's products in the INTERNATIONAL ELECTRICAL

CODE® series and the purchasers of ICC's two publications are

"professional members of a highly technical industry."

Consequently, ICC contends I should discount the likelihood of

confusion among such informed customers.  NFPA resists this

conclusion and refers to Communications Satellite Corp. v.

Comcet, Inc., 429 F.2d 1245 (4th Cir. 1970), where the Court

disagreed with the defendant's argument that the purchasers are

"so sophisticated and knowledgeable that they will not be

confused" because "the expertise of purchasers does not always

assure the absence of confusion."  Having considered both

arguments, I find that the arguable sophistication of prospective

purchasers does not tip this factor in favor of ICC because this

is not a case where the "goods are expensive and purchased [only]

after careful consideration."  Compare Astra Pharmaceutical

Products, Inc. v. Beckman Instruments, 718 F.2d 1201, 1206 (1st

Cir. 1983);[11] and Pignons, 657 F.2d at 489.  The goods in this case are all technical manuals of a sort for electrical wiring that cost well under $100 and are purchased by various participants in the building industry in near instantaneous transactions.  Thus, I do not discount the degree to which these factors favor NFPA.

d. Actual Confusion: The most hotly debated issue is whether NFPA's "evidence" of actual confusion suffices.

"[A]ctual confusion is commercially relevant if the alleged infringer's use of the mark 'could inflict commercial injury in the form of ... a diversion of sales, damage to goodwill, or loss of control over reputation' on the trademark holder."  Beacon Mutual, 376 F.3d at 15 quoting The Sports Authority, Inc. v. Prime Hospitality Corp., 89 F.3d 955, 963 (2d Cir. 1996).  However, Section 1125(a) only "provides a cause of action for the use in commerce of 'any word, term, [or] name' which is 'likely to cause confusion, or to cause mistake, or to *deceive as to the*

---

[11] The Court in Astra explained why there is always less likelihood of confusion where goods are expensive and purchased after careful consideration:  "The sales effort [in selling the computerized blood analyzer machine] is directed to those normally in charge of the lab... It takes from three months to a year to consummate the sale of a Beckman analyzer, involving an average of 55 hours of personal contact between lab personnel and sales representatives. The decision to buy a machine worth thousands of dollars is obviously not done on an impulse, and involves a careful consideration of the reliability and dependability of the manufacturer and seller of the product." Astra, 718 F.2d at 1206.

*affiliation, connection, or association of such person with*

*another person, or as to the origin, sponsorship, or approval of*

*his or her goods, services, or commercial activities by another*

*person*.'"  Attrezzi, LLC v. Maytag Corp., 436 F.3d 32, 36 n. 1

(1st Cir. 2006)(emphasis supplied).  Focusing on this limitation,

ICC argues that "[t]here is no evidence in the record of actual

confusion as to the source of ICC's publications, or confusion as

to whether ICC's publication is approved or sponsored by NFPA, or

affiliated with NFPA.  NFPA's so-called evidence of confusion

focuses on confusion as to the [proper] title of ICC's

publication."  I do not fully agree.

There is no doubt that there is confusion in the industry as

to the proper title for the ICC publications.  It is undisputed

that many third parties have referred to the ICC ELECTRICAL CODE

Administrative Provisions as the International Electrical Code

Administrative Provisions or even just the International

Electrical Code.  ICC's use of the phrase International

Electrical Code to refer to its publications on its e-commerce

website, in its monthly bulletin and on its online membership

application has without a doubt contributed to this general

confusion.

There is also some evidence, loosely defined, of confusion

in the industry as to "the nature and purpose" of the ICC

publications.  That is, whether people in the industry understand

that ICC's publication is an administrative document and not a complete electrical code like ICC's other International Codes and the NEC®.  For instance, NFPA points to an online discussion forum where the moderator and members discussed a proposed bill to remove the NFPA's NATIONAL ELECTRICAL CODE® as Florida's electrical code and replace it with the "INTERNATIONAL ELECTRICAL CODE."  One posting stated: "The more I read the Bill, the more I am starting to wonder if the Florida Building Commission actually thinks the IEC is an actual electrical code and not just an Administrative Code."  NFPA also points to another website, "Mike Holt's Code Forum", which contains the following inquiry from 'wirenut 1980':

> Is the International Electrical Code meant as a supplement to the NEC?  I have a copy and have not found it particularly useful.  It is only 36 pages and it does not touch on safety.  Pretty much it touches on procedures for permits, fees, enforcement, inspection, etc. Is there an international electrical code that is comparable to the NEC in terms of content?

The parties also dispute whether or not ICC accurately advertizes its publications as "necessary" to implement or administer the NEC®.  These assertions and arguments are not relevant to the form of unfair competition NFPA presses in its motion for partial summary judgment; that is, trademark infringement under the Lanham Act as opposed to false advertizing.  See discussion *infra* Section II.C.1.b.

More to the point then, the only evidence brought to my

attention that directly suggests affiliation or source confusion is a printout of the website of the Town of Seabrook, New Hampshire and part of Stauffer's deposition testimony and expert report.

The Seabrook website lists the building codes adopted by the town, which includes seven codes published by ICC and the "International Electrical Code 2000, published by the National Fire Protection Association."  Since NFPA did not publish an International Electrical Code 2000, rather it was published by ICC, it appears that at least the Town of Seabrook is confused about the source of the "International Electrical Code 2000".

In his expert report, Stauffer[12] indicated that he has personally communicated with electricians and other contractors who have called him to ask technical questions about the "International Electrical Code" and its relationship with NEC®. Similarly, in his deposition, Stauffer testified that callers also made "general inquiries along the lines of 'what is this International Electrical Code anyway? Is it part of the NEC?'"[13]

---

[12]  Stauffer offered his expert report and deposition testimony based on his professional experience and involvement in regulatory codes and standards for electrical construction.  He is currently the Executive Director of Standards and Safety for the National Electrical Contractors Association. He is also the author of the *User's Guide to the National Electrical Code®*, which is published by the NFPA.

[13] Stauffer's account of communications with these callers is not hearsay because it is not "offered in evidence to prove the truth of the matter asserted."  Fed.R.Evid. 801(c).  I only

But see Stauffer's Deposition, pp. 106-08, discussed *infra*.

"While not as accurate as a survey might have been," nor as comprehensive as evidence in other cases, "this evidence shows that [at least] some people were actually confused as to who sponsor[s]" the ICC's publications.  Id. at 31-32.  More of this kind of direct affiliation and source confusion evidence would have made the case for actual confusion stronger, but I find that the circumstances are such that I find that ICC's unauthorized use of INTERNATIONAL ELECTRICAL CODE on its e-commerce website, in its monthly bulletin and on its online membership application caused actual confusion.

e. ICC's Intent in Using the Mark: Despite NFPA's dogged attempt to establish ICC's bad faith and intentional scheme to confuse,[14] I find insufficient evidence to contradict ICC's

---

consider these statements as evidence showing that the declarants were confused about the relationship between the ICC's publications and the NFPA.  Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 31 (1st Cir. 1989)("The statement was made not to prove that the defendants' shirts were in fact officially authorized, but rather to show that the declarant, a member of the public, believed that they were officially authorized.").

[14] NFPA also suggests that because "ICC proceeded to destroy its computer tabs that evidenced ICC's repeated use of NFPA's International Electrical Code® mark on ICC's web-page ... soon after NFPA filed the instant action" I should draw an adverse inference against ICC citing Nation-Wide Check Corp. v. Forest Hills, 692 F.2d 214, 219 (1982).  I am not convinced that ICC's policy of overwriting its back up tapes, as described in the letter found as Ex. 4 to the Winder Affidavit, suggests bad faith evidence destruction.

assertion that its use of INTERNATIONAL ELECTRICAL CODE to refer to its Administrative Provisions was inadvert and not willful or fraudulent.

ICC maintains that, in accordance with the Settlement Agreement, it "sought to eliminate all references to the International Electrical Code in all media forms, or to change those references to ICC ELECTRICAL CODE"; "sent e-mails to its employees advising them of the Settlement Agreement, and instructing them not to use the INTERNATIONAL ELECTRICAL CODE mark"; and "periodically reminded its employees of the proper title of the ICC ELECTRICAL CODE Administrative Provisions."  ICC further states that when it "learned that one of its employees had inadvertently used the phrase 'International Electrical Code,' [it] took prompt steps to correct the mistake, and then continued to investigate the matter in an effort to eradicate any other inadvertent uses of the phrase."  The undisputed evidence suggests that ICC did in fact remove the reference to INTERNATIONAL ELECTRICAL CODE from its online membership application form.

The parties disagree about ICC's efforts with respect to third parties.  ICC claims that it has also "on occasion, contacted its resellers directly to inform them of the proper name of the ICC Electrical Provisions."  NFPA does not specifically contradict this statement, but it argues that "ICC

has done nothing to dispel confusion over the Publication's title, use and affiliation."  This disagreement does not undermine the other undisputed facts and since NFPA is the moving party on this issue, I must draw all reasonable inferences in favor of ICC.  Thus, I find insufficient evidence to conclude that ICC's post Settlement Agreement use of INTERNATIONAL ELECTRICAL CODE was made in bad faith.  I note further that this factor would be significant at this stage only where "an alleged infringer copied a mark in bad faith; a converse finding of good faith carries 'little weight'."  Beacon Mutual, 376 F.3d at 19 citing I.P. Lund, 163 F.3d at 44.

f. The Strength of NFPA's Mark: The record before me requires a nuanced evaluation of the strength I should attribute to NFPA's mark INTERNATIONAL ELECTRICAL CODE.

Courts must consider "the length of time the mark has been used, its renown in the plaintiff's field of business, and the plaintiff's actions to promote the mark."  Star Financial Services v. Aastar Mortgage Corp., 89 F.3d 5, 11 (1st Cir. 1996).  Here, NFPA sought to register the mark in 1996.  It has been using the mark since 1997, when it first used it on the 1996 edition of its Spanish version of the NEC®, Código Eléctrico Nacional.  Since then, NFPA has used the mark on various editions of a dozen or so publications that it wishes to identify as part of the INTERNATIONAL ELECTRICAL CODE® series.

ICC does not dispute that NFPA has sold over 2.75 million copies of publications bearing NFPA's INTERNATIONAL ELECTRICAL CODE® mark, nor does it challenge the "muscularity" of NFPA's mark for its anchor publication, the NEC® mark.  Instead, ICC notes that "there is no evidence in the summary judgment record that NFPA has invested substantial sums in promoting the INTERNATIONAL ELECTRICAL CODE mark." ICC also argues that NFPA has not been vigilant in protecting this mark.  Given the comparative lack of evidence about the strength of NFPA's relevant INTERNATIONAL ELECTRICAL CODE® mark, as opposed to the NEC® mark, and NFPA's burden as the moving party, I decline to give substantial weight to this factor.

In addition, I note that in attempting to prove actual confusion, NFPA has argued that many third parties continue to refer to the ICC ELECTRICAL CODE Administrative Provisions as the International Electrical Code Administrative Provisions or even just the International Electrical Code.  While some of this confusion is likely attributable to ICC's wrongful use of NFPA's INTERNATIONAL ELECTRICAL CODE series as discussed above, the continued use of INTERNATIONAL ELECTRICAL CODE to refer to ICC's publications also somewhat undermines the strength of NFPA's mark.

g. Conclusion:  In sum, I find that all but the last two factors favor NFPA and allow the Plaintiff to meet its burden of

showing that there is a strong likelihood of confusion.  While

the evidence of actual confusion is far from overwhelming, NFPA

does not need, as it points out, to provide evidence of actual

confusion to prevail because "[t]he test of infringement is the

likelihood of confusion, not the proof of actual confusion." See

generally Baker v. Simmons, 307 F.2d 458, 462 (1st Cir. 1962); HQ

Network Systems, 755 F.Supp. at 1119 (holding that plaintiff

"need not show actual confusion in order to prevail on its claim

of service mark infringement.  Mere likelihood of confusion is

enough.")

In support of my conclusion, I again note ICC's adamant

assertions in its Answer in the 1999 Lawsuit that:

> ICC admits that there is a segment of the public which
> is likely to be confused, mistaken and deceived by
> NFPA's use of the phrase "International Electrical
> Code," and ICC's simultaneous use of one or more of its
> family of trademarks that include the root phrase
> "INTERNATIONAL ___ CODE," including the use by ICC of
> its INTERNATIONAL ELECTRICAL CODE trademark.  ICC
> further admits that there is a segment of the public
> which is likely to be confused, deceived or mistaken,
> as to whether there is an affiliation, connection,
> sponsorship, endorsement or approval between ICC and
> NFPA, or their respective goods, because of the
> simultaneous use of the "International Electrical Code"
> mark.

Accordingly, I conclude NFPA is entitled to partial summary

judgment for liability against ICC on the trademark infringement

claim as to ICC's admitted use of NFPA's mark INTERNATIONAL

ELECTRICAL CODE.

3. Declaratory Judgment (Count III)

NFPA seeks in its complaint, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, a declaration that ICC has "no right to use the marks 'INTERNATIONAL ELECTRICAL CODE,' 'INTERNATIONAL CODE COUNCIL ELECTRICAL CODE' and 'ICC ELECTRICAL CODE' and that [ICC's] use of the marks ... infringes NFPA's INTERNATIONAL ELECTRICAL CODE® mark and has caused, and will cause, confusion amongst purchasers and potential consumers of the NFPA's INTERNATIONAL ELECTRICAL CODE®."  In the motion for partial summary judgment now before me, however, NFPA seeks only a declaration with respect to ICC's right to use its trademark "INTERNATIONAL ELECTRICAL CODE."

ICC argues that entering a declaratory judgment is inappropriate because it "has never claimed a 'right' to use the phrase 'International Electrical Code.'  Rather, ICC says it has repeatedly informed NFPA that its use of that phrase was inadvertent and unintentional."[15]  A declaratory judgment may, however, be appropriate despite suggestions of mootness, even if the defendant voluntarily ceased the act complained.  City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982).

The Declaratory Judgment Act provides that: "In a case of

_____

[15] I note that ICC's assertion would be more accurate if it were qualified that it has not claimed a right to use NFPA's mark since the execution of the Settlement Agreement.

actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).  "The statutory provision limiting declaratory judgments to 'cases of actual controversy' is no more than a recognition that the federal judicial power extends only to 'cases' or 'controversies' in the constitutional sense." Indemnity Insurance Co. of North America v. Kellas, 173 F.2d 120, 123 (1st Cir. 1949) citing Aetna Life Insurance Co. v. Haworth, 300 U.S. 227, 239-240 (1937).  "The distinction is between a case 'appropriate for judicial determination', on the one hand, and a 'difference or dispute of a hypothetical or abstract character', on the other -- a distinction which 'is necessarily one of degree.'" Id. 123-24 citing Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941).

There is nothing hypothetical about the recurrent and ongoing disputes between the parties.  Given the litigation history between them, even following the Settlement Agreement, I will exercise my power to enter the requested Declaratory Judgment, recognizing that ICC now admits that it has no right to use NFPA's trademark and claims to have stopped using it.

**C. ICC's use of INTERNATIONAL CODE COUNCIL (ICC) ELECTRICAL CODE**

ICC's liability cross-motion seeks summary judgment as to all of NFPA's claims relating to ICC's use of the marks INTERNATIONAL CODE COUNCIL ELECTRICAL CODE and ICC ELECTRICAL CODE. Specifically, ICC contends that it is entitled to summary judgment as to these marks under Counts I (trademark infringement), II (false designation of origin) and VI (unfair competition) because NFPA cannot establish a likelihood of confusion; and that it is entitled to summary judgment as to Counts III (declaratory judgment), V (breach of the covenant of good faith and fair dealing), VII (unjust enrichment), and VIII (ch. 93A) for the same reasons it is entitled to summary judgment as to Count IV (breach of contract): that the Settlement Agreement authorizes it to use the marks INTERNATIONAL CODE COUNCIL ELECTRICAL CODE and ICC ELECTRICAL CODE. Consequently, I consider ICC's liability motion in two parts, first addressing the alleged unfair competition claims, broadly conceived, and then addressing the alleged breach of contract claims, also broadly conceived. In considering ICC's liability for the alleged breach of contract, I also consider ICC's counterclaim against NFPA that it breached the Settlement Agreement by bringing this action against ICC for using the mark INTERNATIONAL CODE COUNCIL ELECTRICAL CODE.

1. Trademark Infringement, False Designation of Origin, & Unfair Competition (Counts I, II and VI)

As to the unfair competition claims, broadly conceived, ICC seeks entry of summary against NFPA with respect to its claim that ICC's use of ICC ELECTRICAL CODE and INTERNATIONAL CODE COUNCIL ELECTRICAL CODE amounts to trademark infringement under § 32 of the Lanham Act, false designation of origin under § 43(a)(1) of the Lanham Act, and unfair competition under state law.  "The elements of each of these causes of action are essentially similar, and the same set of facts will support a suit for either."  Schutt Mfg. Co. v. Riddell, Inc., 673 F.2d 202, 206 (7th Cir. 1982).[16]  The central question to be resolved as to each of the claims is whether ICC's use of the marks ICC

---

[16] "Unfair competition, in its common law signification, implies palming off."  Smartfoods, Inc. v. Northbrook Property and Cas. Co., 35 Mass.App.Ct. 239, 244 (1993).  As under federal law, the confusion referred to in unfair competition claims has been extended from the traditional confusion as to source or origin of goods or services, to the factors of sponsorship or endorsement.  Planned Parenthood Federation of America, Inc. v. Problem Pregnancy of Worcester, Inc., 398 Mass. 480, 489 (1986) "The plaintiff need only show a likelihood of confusion in order to be entitled to equitable relief.  However, actual confusion, which is present in this case, is the best evidence of likelihood of confusion."  Id. (internal citations omitted).  "Likelihood of confusion is whether the 'similarity of names is such as to make likely the deception of any appreciable number of ordinary prudent customers.'" Id. at 489 n. 10 quoting I.T.S. Industria Tessuti Speciali v. Aerfab Corp., 280 F.Supp. 581, 586 (S.D.N.Y. 1967).
Similarly, although section 15 U.S.C. § 1125(a)(1)(A) "creates a federal statutory tort broader in scope than the common law of unfair competition and the law of infringement, ... a showing that the marks or packaging of defendant create a likelihood of confusion with the products of the plaintiff ... [is still] a key to establishing a claim of false designation of origin."  Purolator, 687 F.2d at 560-61.

ELECTRICAL CODE and INTERNATIONAL CODE COUNCIL ELECTRICAL CODE as part of the titles for its Administrative Provisions publications creates a likelihood of confusion with NFPA's INTERNATIONAL ELECTRICAL CODE® series of publications.

The analysis for the second, third, fourth, fifth and eighth factors discussed *supra* with respect to ICC's unauthorized use of INTERNATIONAL ELECTRICAL CODE does not change with the change of focus in this Section, except for shifting the burden to ICC as the moving party on this issue.  Consequently, the second, third, fourth, and fifth factors favor NFPA, whereas I continue to give little weight to the eighth factor (strength of NFPA's INTERNATIONAL ELECTRICAL CODE mark).  I therefore re-analyze only the first (similarity of the marks), sixth (evidence only actual confusion), and seventh (defendant's intent in adopting its mark) factors as they apply to ICC's use of the ICC ELECTRICAL CODE AND INTERNATIONAL CODE COUNCIL ELECTRICAL CODE variants.

a. Similarity of the Marks: "[S]imilarity is determined on the basis of the total effect of the designation, rather than a comparison of individual features." Pignons, 657 F.2d at 487 (citations omitted).  Some of the factors that courts have considered when assessing the similarity of the marks are the phonetics, font, design, layout, color scheme, total number of words and syllables, spelling and pronunciation.  "Meaning alone, without reference to appearance and sound, may [also] be

sufficiently close to constitute similarity."  <u>Boston Athletic</u>

<u>Ass'n v. Sullivan</u>, 867 F.2d 22, 29 (1st Cir. 1989) <u>citing</u> 3A

Callman § 20.18.

Here, the marks at issue are comprised only of text used on

the cover of publications related to electrical code standards.

Clearly, the challenged marks use overlapping descriptive words.

NFPA's mark has three generic words: International, Electrical,

and Code.  Pointing out the obvious then, the mark ICC ELECTRICAL

CODE shares its last two words with NFPA's mark; and the mark

INTERNATIONAL CODE COUNCIL ELECTRICAL CODE uses all three of the

words that comprise NFPA's mark, but injects the words "Code

Council" in the middle.

NFPA's mark is usually printed in all uppercase letters

followed by the symbol "®" and the word "SERIES."  The NFPA

publications presented to the court display the INTERNATIONAL

ELECTRICAL CODE® series mark as a subtitle in a smaller font

below the title of the publications.  In contrast, ICC's

publications use the challenged marks in large uppercase font,

followed by the words "Administrative Provisions" in smaller

font.  However, the ICC does not always describe its 2000 and

2003 publications with the words Administrative Provisions.

Despite the apparent but superficial differences, I find

that the dominant wording in all three of the marks is the phrase

"electrical code." <u>See</u> <u>OneBeacon</u>, 376 F.3d at 18 <u>citing</u> 3

McCarthy §23:44 ("If the 'dominant' portion of both marks is the same, then confusion may be likely, notwithstanding peripheral differences.") Arguably distinguishing the similarity between the dominant portions is that the differentiating element -- ICC and INTERNATIONAL CODE COUNCIL -- is ICC's company name, the latter of which is an ICC registered trademark.

ICC argues that "the Court of Appeals and other courts have stressed that 'otherwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer.' Pignons, 657 F.2d at 487 (finding that defendant Polaroid's use of the mark "Alpha" was not likely to be confused with the plaintiff's mark "Alpha" because the word "Polaroid" was displayed in close proximity to the word "Alpha" on Polaroid's cameras and in its advertising)." On the other hand, the First Circuit has also said that "even where defendant clearly marked its product with its company name, similarity might be found." Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 29 (1st Cir. 1989) citing Astra, 718 F.2d at 1205. Furthermore, in this case, the name INTERNATIONAL CODE COUNCIL contributes to the overlapping words.

"When one uses a mark similar to one already in use, there is generally an affirmative duty to avoid the likelihood of confusion."  BAA, 867 F.2d at 29 citing Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 817-818 (1st Cir.

1987).  Drawing all reasonable inferences in favor of NFPA, the non-moving party on this issue, I find that the presence of ICC's company name is not enough to avoid the conclusion "that while the marks are not identical, they are at least similar for the purposes of the present review." Astra, 718 F.2d at 1205.[17] "[F]ew would be stupid enough to make exact copies of another's mark or symbol.  It has been well said that the most successful form of copying is to employ enough points of similarity to confuse the public with enough points of difference to confuse the courts." BAA, 867 F.2d at 30 citing Baker v. Master Printers Union of New Jersey, 34 F.Supp. 808, 811 (D.N.J. 1940).

   b. Actual Confusion: The evidence supporting actual

-------

   [17] In Astra, as here with respect to INTERNATIONAL CODE COUNCIL (ICC) ELECTRICAL CODE, the defendant sought summary judgment.  The Court held:

> It is well settled that under certain circumstances otherwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer. Pignons, 657 F.2d at 487; Fisher Stoves, Inc. v. All Nighter Stove Works, Inc., 626 F.2d 193, 194-95 (1st Cir. 1980).  This rule would seem to apply in this case, where the Beckman name is clearly visible on the analyzer. Nevertheless, in reviewing the granting of the summary judgment, we must consider the evidence in the light most favorable to the appellant. Under this standard, the presence of the word 'ASTRA' on both Beckman and Astra products leads us to conclude that while the marks are not identical, they are at least similar for the purposes of the present review.

Astra Pharmaceutical Products, Inc. v. Beckman, 718 F.2d 1201, 1205 (1st Cir. 1983)

confusion is the same as discussed above in connection with ICC's unauthorized use of INTERNATIONAL ELECTRICAL CODE.  However, I am concerned now solely with any confusion attributable to ICC's use of ICC ELECTRICAL CODE and INTERNATIONAL CODE COUNCIL ELECTRICAL, and not its unauthorized use of INTERNATIONAL ELECTRICAL CODE.

In this connection, ICC has obtained significant concessions by NFPA's expert.  In his deposition, Stauffer bluntly stated "I don't believe persons in the industry feel that the ICC Electrical Code Administrative Provisions is an NFPA publication," thereby denying the existence of source confusion among persons in the industry. This denial is further evidenced in the following exchange:

> Q. Do you have any knowledge of anyone in the industry being confused about whether the ICC Electrical Provisions are an ICC publication versus an NFPA publication?
>
> A. It is my expert opinion that every time anybody in my industry uses the term International Electrical Code or ICC Electrical Code, they are referring to the smaller booklet published by the International Code Council.
>
> Q. . . . Why don't we look at tab 6. The first document in tab 6 is the ICC Electrical Code Administrative Provisions 2000. Do you have any knowledge of any person being confused about whether this was an NFPA publication?
>
> A. No.
>
> Q. And the other document in there is the International Code Council Electrical Code Administrative Provisions 2003. Do you have any knowledge of any person being confused about whether this is an NFPA publication?
>
> A. No.
>
> Q. Do you have any knowledge of any person being

confused about whether this is a publication that is sponsored by NFPA.

A. I don't understand the difference between the last two questions, but my answer is no.

Q. Do you have any knowledge of any person being confused about whether this publication is affiliated with NFPA.

A. Same answer.

Q. Do you have any knowledge as to whether any person has been confused about whether this publication has been approved by NFPA?

A. Same answer.

Q. Okay. And I was asking you about the 2003 document. Would you have the same answers with respect to the 2000 ICC Electrical Code.

A. Yes.

[Stauffer Deposition, pp. 106-8.]

I do not bind NFPA conclusively to its expert's concessions. Nevertheless, Stauffer's testimony regarding confusion provides considerable support for ICC's position on the actual confusion factor.

NFPA's arguments about confusion in the industry as to "the nature and purpose" of the ICC publications and whether ICC misrepresents its publications as "necessary" to implement or administer the NEC® do not repair the damage done by Stauffer or help meet its burden.  NFPA asserts claims under trademark infringement (Count I), false designation of origin under § 43(a)(1) of the Lanham Act (Count II) and unfair competition (Count VI), not false advertizing.[18] "Trademark infringement and

---

[18] Count II of NFPA's Complaint purports to state a cause of action under § 43(a)(1) of the Lanham Act without specifying

-42-

unfair competition laws exist largely to protect the public from confusion anent the actual source of goods or services." International Ass'n of Machinists, 103 F.3d at 200.[19]  These causes of action are therefore distinct from state and federal false advertizing or deceptive marketing laws, like § 43(a)(1)(B)

_____

which of the two prongs, (A) false designation of origin or (B) false advertising, it is based on.  However, the Complaint only includes "a short and plain statement of the claim showing that the pleader is entitled to relief" under the first prong.  Fed. R. Civ. P. 8(a)(2).  NFPA alleges that ICC's use of the contested marks is a false and misleading representation "as it falsely represents an affiliation, connection, association, sponsorship, endorsement or approval by the NFPA of ICC's Publication, and an affiliation or connection between the NATIONAL ELECTRICAL CODE® and ICC's Publication." [Complaint, ¶ 43]  In none of its subsequent filings does NFPA try to expand the scope of Count II to include false advertizing, nor does NFPA refer to or discuss the five elements required to succeed in a false advertising claim under the Lanham Act.  See Cashmere & Camel Hair Manufacturers Institute v. Saks Fifth Avenue, 284 F.3d 302, 310-11 (1st Cir. 2002).

[19] Similar to trademark infringement, the statutory tort of false designation of origin "is designed to reach, among other things, attempts to appropriate the goodwill associated with a competitor's trademark *by means of confusingly similar marking and packaging, which would create the impression that the products of the defendant originated with the plaintiff*." Purolator, 687 F.2d at 561 (emphasis supplied).  The tort of unfair competition in Massachusetts only gives those "whose trade name has acquired a secondary meaning in the minds of the public as indicating the origin of his products or as identifying his goods known to them by a trade name has the right to have his trade name protected by securing an injunction *to prevent another from using the same name or a name so similar as to mislead the public into buying the defendant's goods in the belief that they were buying those of the plaintiff and from palming off his goods as those of the plaintiff to the injury of the latter*." Planned Parenthood, 398 Mass. at 485 quoting Monroe Stationers & Printers, Inc. v. Munroe Stationers, Inc., 332 Mass. 278, 280 (1955)(emphasis supplied).

of the Lanham Act, which provide a remedy where someone "who, in connection with the marketing of goods or services, makes a representation relating to the actor's *own* goods, services, or commercial activities that is likely to deceive or mislead prospective purchasers to the likely commercial detriment of another[.]"  Restatement (Third) of Unfair Competition § 2 (1995)(emphasis supplied); see also Cashmere & Camel Hair Manufacturers Institute v. Saks Fifth Avenue, 284 F.3d 302, 310-11 (1st Cir. 2002).

Returning to the issue of actual source or affiliation confusion, there is still to be considered the printout of the website of the Town of Seabrook, New Hampshire and Stauffer's deposition testimony and expert report about his communications with confused electricians and other contractors.  ICC bears the burden of establishing that there is no genuine issue of material fact on this issue.  Consequently, I find that this evidence satisfies NFPA's burden of pointing to specific facts demonstrating that there is a trialworthy issue.  While more direct source or affiliation confusion evidence would have made the case for actual confusion stronger, there is enough for a reasonable juror to find actual confusion, drawing reasonable inferences in favor of NFPA.

c. ICC's Intent in Using the Marks ICC ELECTRICAL CODE and INTERNATIONAL CODE COUNCIL ELECTRICAL CODE:  NFPA characterizes

ICC's intent in a negative light suggesting,

> Undeterred and in violation of the terms of the Agreement, ICC sought to place confusingly similar marks on its Publication and to affiliate its Publication with the NFPA's National Electrical Code®. While ICC argues that its use of its tradename in connection with the words "electrical code" negates any bad intent on ICC's part, the Publication is not a comprehensive electrical code. ICC purposefully chose words describing the Publication that not only misidentify the product, but that also create a false association with the National Electrical Code.

ICC's use of the mark "NATIONAL ELECTRICAL CODE" is not being challenged and it is only indirectly consequential that ICC's publication is not a "comprehensive electrical code." The issue is whether ICC's adoption of the replacement names for its publications was done in bad faith.

ICC was obviously aware of the past litigation and the terms of the Settlement Agreement when it selected the replacement names. Notably, however, the Settlement Agreement did not contain a provision prohibiting ICC from republishing its Administrative Provisions under another name. Thus, the question is whether ICC chose its replacement names in an underhanded defiance of the Settlement Agreement.

ICC applied to register the trademark ICC ELECTRICAL CODE shortly before and during negotiations preceding the execution of the Settlement. It did so without advising NFPA. While the Settlement Agreement did not specifically forbid ICC from republishing its Administrative Provisions under a different name

and it did not specifically forbid ICC from using the chosen replacement names, I find that there is, nonetheless, a genuine issue of material fact as to whether ICC adopted the names in bad faith with the purpose of cutting corners on the prospective Settlement Agreement.

d. Conclusion: Considering all of the factors and the record in the light most favorable to NFPA, I find that there is a genuine issue of material fact about whether potential purchasers and those "whose confusion threatens the trademark owner's commercial interest in its mark," Beacon Mutual, 376 F.3d at 16, would likely be confused or misled into believing that ICC's publications were produced by or affiliated with NFPA causing commercial injury to NFPA.  Accordingly, I deny summary judgment to ICC on Counts I, II, and VI with respect to ICC's use of ICC ELECTRICAL CODE and INTERNATIONAL CODE COUNCIL ELECTRICAL CODE.

2. Breach of Contract (Counts III, IV, V, and VII)

NFPA also challenges ICC's use of the marks ICC ELECTRICAL CODE and INTERNATIONAL CODE COUNCIL ELECTRICAL CODE as allegedly "confusingly similar" to its trademark INTERNATIONAL ELECTRICAL CODE® in breach of the Settlement Agreement.  ICC defends the titles of its 2000 and 2003 Administrative Provisions on the basis that the Agreement permits it to use its names (ICC and International Code Council) combined with the generic term

-46-

"Electrical Code."  ICC also brings a counterclaim against NFPA

for challenging its use of the mark INTERNATIONAL CODE COUNCIL

ELECTRICAL CODE in breach of NFPA's promise in the Settlement

Agreement not to object to or take any action to prevent or

impair ICC's use of the ICC Marks.

Under Massachusetts law,[20] "[c]ontract interpretation is

largely an individualized process, with the conclusion in a

particular case turning on the particular language used against

the background of other indicia of the parties' intention." Shea

v. Bay State Gas Co., 383 Mass. 218, 222-223 (1981) citing United

States v. Seckinger, 397 U.S. 203, 213 n. 17 (1970).  I must

"construe the contract with reference to the situation of the

parties when they made it and to the objects sought to be

accomplished." Id. at 223.

Massachusetts courts recognize a series of canons as aids to

the interpretation of contracts.  For instance, "[i]t is a canon

of construction that every word and phrase of an instrument is if

possible to be given meaning."  Massachusetts Insurers Insolvency

---

[20] The choice of law clause in the Settlement Agreement
states that "[t]his Agreement shall be construed in accordance
with the laws of Massachusetts."  In their briefing, both sides
have cited Massachusetts law for their breach of contract claims.
Given the agreement between the parties, and the absence of any
suggestion of other applicable law, I apply Massachusetts law in
this case without inquiring further. See McAdams v. Massachusetts
Mutual Life Ins. Co., 391 F.3d 287, 298 (1st Cir. 2004) citing
Hershey v. Donaldson, Lufkin & Jenrette Securities Corp., 317
F.3d 16, 20 (1st Cir. 2003).

Fund v. The Premier Insurance Co. of Massachusetts, 439 Mass. 318, 322 (2003) quoting National Shawmut Bank v. Joy, 315 Mass. 457, 466 (1944), since "a contract is to be construed to give reasonable effect to each of its provisions."  J.A. Sullivan Corp. v. Com., 397 Mass. 789, (1986) citing McMahon v. Monarch Life Ins. Co., 345 Mass. 261, 264 (1962).  See also Restatement (Second) of Contracts, § 202 (1981).  Another canon provides that courts are to give greater weight to specific and exact terms than general language when the meaning of the provisions is in doubt.  Restatement (Second) of Contracts § 203(c)(1981), comment a; Kobico, Inc. v. Pipe, 44 Mass.App.Ct. 103, 108 (1997); Arcari v. Marder, 225 B.R. 253, 256 (D. Mass. 1998).  In any event, "[c]ommon sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons."  Massachusetts Insurers Insolvency, 439 Mass. at 322 quoting Cadle Co. v. Vargas, 55 Mass.App.Ct. 361, 366 (2002)(quoting Fishman v. LaSalle Nat'l Bank, 247 F.3d 300, 302 (1st Cir.2001)).

ICC alleges that it has the right to use the titles of its 2000 and 2003 Administrative Provisions and that NFPA breached paragraphs A-8, A-9, A-13 and A-14 of the Settlement Agreement by challenging ICC's use of INTERNATIONAL CODE COUNCIL ELECTRICAL CODE.  These paragraphs provide:

> Except as otherwise provided herein, NFPA recognizes that
> ICC is the exclusive owner of trademarks in the form of
> "INTERNATIONAL ___ CODE," including but not limited to:
> "INTERNATIONAL PLUMBING CODE," "INTERNATIONAL PRIVATE SEWAGE

DISPOSAL CODE," ..., "INTERNATIONAL ADMINISTRATIVE CODE," ... "INTERNATIONAL HOUSING CODE" (collectively, the "ICC Marks"). NFPA further recognizes that ICC is the exclusive owner of the trademark "INTERNATIONAL CODE COUNCIL." [¶ A-8.] (emphasis supplied)

As part of this understanding, except as provided in paragraphs 1, 3, 4, and 5 of this section, NFPA specifically recognizes ICC and the ICC Parties' right to register and use without opposition or interference all trademarks, using "INTERNATIONAL ___ CODE," including all such marks, except for the NFPA Marks, that are currently being used by, or that are the subject of any trademark registration filed by the ICC and/or the ICC Parties, as well as any future mark or marks that ICC or the ICC Parties may develop using this phrase. [¶ A-9.] (emphasis supplied)

... Except as otherwise provided herein, NFPA will not object to nor directly or indirectly take any action or cause any action to be taken that would impair or prevent the use or trademark registration by the ICC or the ICC Parties of any of the ICC Marks worldwide... [¶ A-13.] (emphasis supplied)

Except as provided in paragraphs 1 and 3 of this section, NFPA will not use, seek to register, or object to the use or registration by the ICC or the ICC Parties of any trademark using the mark "INTERNATIONAL ___ CODE" or any marks confusingly similar thereto. [ ¶ A-14.] (emphasis supplied)

These sections of the Settlement Agreement embody NFPA's promise that it would not object to or take any action to prevent or impair ICC's use or registration of any of the ICC Marks worldwide or any trademark using the form "INTERNATIONAL ___ CODE" or any marks confusingly similar thereto. While the mark ICC ELECTRICAL CODE does not squarely fit within the definition of the protected ICC Marks, INTERNATIONAL CODE COUNCIL ELECTRICAL CODE -- like

-49-

INTERNATIONAL ADMINISTRATIVE CODE, INTERNATIONAL ENERGY CONSERVATION CODE, and INTERNATIONAL ONE & TWO FAMILY DWELLING CODE -- does.  Thus, except as otherwise provided in the Agreement, ICC is correct that NFPA could be said to have promised in ¶¶ A-13 and A-14 it would not object to ICC's use of the title INTERNATIONAL CODE COUNCIL ELECTRICAL CODE.

For its part, NFPA argues that the paragraphs cited by ICC must be read in light of the rest of the Agreement, and paragraphs A-1 and A-3 in particular, which provide:

> ICC and the ICC Parties recognize that NFPA is the exclusive owner of the trademark "INTERNATIONAL ELECTRICAL CODE." [¶ A-1.]

> ICC and the ICC Parties will not use the following trademarks, or any trademarks confusingly similar to the following trademarks, except in reference to the goods or services of NFPA: "INTERNATIONAL ELECTRICAL CODE," "NEC," "NATIONAL ELECTRICAL CODE," "CODIGO ELECTRICO NACIONAL" (collectively, the 'NFPA Marks').[¶ A-3.](emphasis supplied)

The following additional sections provide support for NFPA's argument that it is entitled to file suit if ICC is in breach of ICC's promises in ¶¶ A-1 and A-3.

> Upon the execution of this Agreement by the parties hereto, this Agreement shall constitute a MUTUAL RELEASE, REMISE, AND IRREVOCABLE DISCHARGE by NFPA of ICC and the ICC Parties and by ICC and the ICC Parties of NFPA of any and all claims ... whatsoever which (i) NFPA may have had, from the beginning of the world to the present, against ICC and the ICC Parties, and (ii) which ICC and the ICC Parties may have

had, from the beginning of the world to the present, against NFPA, by reason of the events which resulted in the Civil Action, and facts underlying the same, it being understood and agreed that execution of this Agreement constitutes full settlement, satisfaction and discharge of any and all claims, rights damages, demands, causes of action and/or liabilities of any nature whatsoever, which were or could have been asserted in the Civil Action; provided, however, that this Agreement is not intended to and does not relieve the parties of liability for the obligations expressly assumed herein. [¶ F.] (emphasis supplied)

This Agreement shall be construed in accordance with the laws of Massachusetts.  The parties agree that jurisdiction and venue for any action brought to enforce the terms of this Agreement shall be in the United States District Court for the District of Massachusetts. [¶ G-6.](emphasis supplied)

Reading this Agreement as a whole, I find that NFPA promised in ¶¶ A-13 and A-14 not to object to or taken any action to prevent or impair ICC's use of ICC Marks and any trademark using mark in the form "INTERNATIONAL ___ CODE" or any marks confusingly similar thereto, except that it may object by filing suit in this Court to ICC's use of the trademark "INTERNATIONAL ELECTRICAL CODE" or any trademarks confusingly similar to "INTERNATIONAL ELECTRICAL CODE" pursuant to ¶¶ A-1, A-3, F, and G-6.  This resolution provides a reasonable, common sense interpretation of the competing clauses.  It also takes into account the core purpose of the Agreement, which was the resolution of who could use the mark INTERNATIONAL ELECTRICAL CODE, by permitting NFPA to file suit against ICC if ICC continued to use the mark INTERNATIONAL ELECTRICAL CODE pursuant

-51-

to ¶¶ A-1, A-3, F, and G-6 without breaching ICC's rights in ¶¶ A-8, A-9, A-13 and A-14, even though INTERNATIONAL ELECTRICAL CODE literally fits within the definition of ICC Marks in ¶ A-8. It also allows NFPA, as the exclusive owner of the trademark INTERNATIONAL ELECTRICAL CODE, to challenge ICC's use of marks "confusingly similar" to INTERNATIONAL ELECTRICAL CODE.

I am not persuaded by ICC's argument that "[t]he general statement that ICC will not use any mark 'confusingly similar' to INTERNATIONAL ELECTRICAL CODE [in ¶ A-3] must give way to [the] specific reservations" in ¶ A-8 that ICC is the exclusive owner of the trademark INTERNATIONAL CODE COUNCIL, its company name, and in other paragraphs that ICC has "the right to use all current and future marks in the form of INTERNATIONAL ___ CODE." The rationale for this argument rests on but one of the many canons used as an aid when interpreting a contract and ignores the principle that when interpreting a contract, a court must read the agreement as a whole. McAdams v. Massachusetts Mutual Life Ins. Co., 391 F.3d 287, 299 (1st Cir. 2004) citing Starr v. Fordham, 420 Mass. 178, 190 (1995).  ICC's proposed reading would preclude NFPA from filing a suit to enforce its rights as exclusive owner of the trademark INTERNATIONAL ELECTRICAL CODE. Furthermore, the specific reservation in ¶ A-8 regarding ICC's tradename comes after the list defining the ICC Marks and the reservation is not included in the operative ¶¶ A-13 and A-14.

Consequently, NFPA's objection to ICC's use of INTERNATIONAL CODE COUNCIL ELECTRICAL CODE is not an actionable failure to recognize ICC's trademark "INTERNATIONAL CODE COUNCIL."

Given my interpretation of the contract, NFPA and ICC's liability to each other on NFPA's breach of contract claim and ICC's counterclaim depends on the scope of the terms "object", "take any action," and "confusingly similar" as used in the Settlement Agreement and whether the mark INTERNATIONAL CODE COUNCIL ELECTRICAL CODE is "confusingly similar" to INTERNATIONAL ELECTRICAL CODE.   If INTERNATIONAL CODE COUNCIL ELECTRICAL CODE and ICC ELECTRICAL CODE are "confusingly similar" to INTERNATIONAL ELECTRICAL CODE, then ICC has breached the Agreement.  If they are not, then NFPA may have breached the Agreement by suing ICC over its use of INTERNATIONAL CODE COUNCIL ELECTRICAL CODE depending on the meaning of "object" and "take any action", and on whether ICC's use of INTERNATIONAL ELECTRICAL CODE excuses NFPA's conduct.

The parties disagree about the meaning of "confusingly similar" as used in ¶ A-3, and presumably in ¶¶ A-13 and A-14. As NFPA points out, the term "confusingly similar" has two potential meanings in trademark law: the general similarity of the marks and the overall likelihood of confusion.  See J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition 23:4 (1999).  The latter meaning would require an analysis of the

eight factors developed for trademark infringement claims under the Lanham Act.  The former meaning is akin to the definition I adopted in Northern Lights Tech., Inc. v. Northern Lights Club, 97 F.Supp.2d 96, 117-18 (D. Mass. 2000), aff'd 236 F.3d 57, 66 fn. 14 (1st Cir. 2001) (approving my conclusion that the "likelihood of confusion" test of trademark infringement is "more comprehensive" than the "identical or confusingly similar" requirement of ACPA, as it requires considering factors beyond the facial similarity of the two marks.")

NFPA argues that the meaning of "confusingly similar" in the 1999 Settlement Agreement is ambiguous, in that it is unclear which of the two meanings the parties intended to adopt, but that parol evidence shows that the parties intended the term to mean the former non-Lanham Act meaning.  In contrast, ICC argues that the term as used the Settlement Agreement is simply shorthand for "likely to create confusion."

Under Massachusetts law, the question of whether a contract term is ambiguous is an issue to be determined by the court. Alison H. v. Byard, 163 F.3d 2, 6 (1st Cir. 1998) (citations omitted).  A contract is only considered ambiguous when the language is "reasonably prone to different interpretations" or "susceptible to differing, but nonetheless plausible, constructions." Lanier Professional Services, Inc. v. Ricci, 192 F.3d 1, 4 (1st Cir. 1999)(citations omitted).  In this case, I

disagree with NFPA that the term is ambiguous.  My decision in Northern Lights, which I decided after the negotiation and execution of the Settlement Agreement, does not persuade me otherwise.  While the term "confusingly similar" may have two meanings if considered in the abstract, as ICC points out, the parties used the phrase "confusingly similar" in the context of settling various Lanham Act and related claims.  Consequently, I find that the parties intended to align their obligations under the Settlement Agreement with their obligations under federal trademark law, having settled the dispute over who would be the exclusive owner of the INTERNATIONAL ELECTRICAL CODE mark.

Since I denied summary judgment to ICC as to Counts I, II, and VI because there is a triable issue of fact as to likelihood of confusion under the Lanham Act, I also find that there is a triable issue as to whether ICC ELECTRICAL CODE and INTERNATIONAL CODE COUNCIL ELECTRICAL CODE are "confusingly similar" to NFPA's mark within the meaning of the Settlement Agreement. Consequently, I deny summary judgment to ICC as to Counts III, IV, V, and VII with respect to ICC's use of ICC ELECTRICAL CODE and INTERNATIONAL CODE COUNCIL ELECTRICAL CODE.

Since I cannot resolve whether ICC breached the Settlement Agreement by adopting ICC ELECTRICAL CODE and INTERNATIONAL CODE COUNCIL ELECTRICAL CODE, I cannot conclusively resolve whether NFPA itself breached the Agreement by bringing this suit against ICC for its use of INTERNATIONAL CODE COUNCIL ELECTRICAL CODE.

Consequently, I also deny summary judgment to ICC on its counterclaim.   However, I do resolve the meaning of the relevant sections of the Settlement Agreement so that this issue can be resolved at trial.

NFPA's negative obligations depend on the meaning of "object" and "take any action" in ¶¶ A-13 and A-14.  As support for the existence of an enforceable covenant not to sue, ICC points to the language in ¶ A-13 where NFPA promised "not [to] object to nor directly or indirectly take any action or cause any action to be taken that would impair or prevent the use ... by the ICC ... of any of the ICC Marks[.]"  ICC contends that this promise necessarily includes the promise not to file a lawsuit that would impair or prevent ICC from using INTERNATIONAL CODE COUNCIL ELECTRICAL CODE as the title of its publication.

Given the context and the purpose of settlement agreements generally, it is certainly arguable that the promise not to "object" and not to "take any action or cause any action to be taken that would impair or prevent" ICC's use of its marks includes a covenant not to sue.  See, e.g., Rossner v. CBS, Inc., 612 F.Supp. 334, 341 (S.D.N.Y. 1985) (finding that defendant's covenant not to object in a prior Agreement was, "in essence, a covenant not to sue," not just a "waiver of objection.") NFPA contends, however, that these words do not amount to a covenant not to sue because ¶ G-6 expressly contemplates one party bringing an action against the other to enforce the terms of the

-56-

Settlement Agreement, and because the Agreement could have included an express covenant not to sue if the parties had intended to do so.[21]

"It is a canon of construction that every word and phrase of an instrument is if possible to be given meaning."  Massachusetts Insurers Insolvency Fund, 439 Mass. at 322 quoting National Shawmut Bank, 315 Mass. at 466.  Consequently, NFPA's promise in ¶ A-13 not to "*take any action* or cause any action to be taken that would impair or prevent" ICC's use of its marks (other than marks confusingly similar to NFPA's marks) ought to be given, if possible, a meaning independent from NFPA's promise in ¶¶ A-13 and A-14 not to "object to" ICC's use of its marks and its promise in ¶ A-11 not to "file, or cause to be filed, oppositions or petitions to cancel any trademark application or registration currently owned by ICC."  Similarly, ICC's reciprocal promise "not [to] directly or indirectly *take any action* or cause any action to be taken that would impair or prevent NFPA's use" of INTERNATIONAL ELECTRICAL CODE in ¶ A-2 ought to be given, if

---

[21]  NFPA also claims that "numerous legal doctrines, including the litigation privilege, the Massachusetts Anti-SLAPP statute, the Noerr Pennington Doctrine, and the First Amendment, protect NFPA from retaliatory claims premised on NFPA's lawful exercise of its right to petition."  But, as ICC points out, NFPA concedes that the parties could have included an enforceable covenant not to sue.  Given that tailored covenants not to sue are enforceable in circumstances like these, I reject NFPA's contention that any of the legal doctrines referenced prevent a counterclaim based on a breach of a covenant not to sue.

possible, a meaning independent from ICC's promise in ¶ A-2 to withdraw its opposition to NFPA's application with the PTO and ICC's promise in ¶ A-6 "not [to] object to the use or trademark registration by NFPA of any of the NFPA Marks."  Accordingly, I find that the scope of each of their promises not to object and not to take any action to prevent or impair each other's use of their own marks includes a promise not to sue over disputes covered by the Settlement Agreement, except to enforce the terms of the Agreement and to determine colorable legal rights under the Agreement.[22]  This means that NFPA has the right under ¶ G-6 to sue ICC for using INTERNATIONAL ELECTRICAL CODE after the execution of the Settlement Agreement in violation of ¶¶ A-1 and A-3; but, NFPA would be in violation of its covenant not to sue in ¶ A-13 if, for instance, it sued ICC for using the mark INTERNATIONAL PLUMBING CODE listed in ¶ A-8.

I add the qualifier that a party is entitled to seek a legal determination of its rights under the Settlement Agreement, in addition to enforcing its express rights under the Agreement, in order to reconcile the quasi-covenant not to sue with the express reservation in ¶ G-6 that a party may bring an action against the other to enforce the terms of the Agreement.  The most reasonable

---

[22] Of course, the promises also include more drastic actions like filing injunction papers seeking to enjoin the other from using a certain mark, sending "cease and desist" letters to the other's customers and distributors, and issuing a press release in connection with the initiation of a lawsuit.

resolution of these competing obligations and protections is that a party may bring an action in good faith for a colorable claim under the Settlement Agreement without breaching its promise not to object or take any action to prevent or impair the other's use of its marks.

Given my conclusion on this issue, I do not need to reach NFPA's additional argument that it was under no obligation to forebear from suing over ICC's use of INTERNATIONAL CODE COUNCIL ELECTRICAL CODE because ICC breached the Agreement before NFPA filed this suit by using NFPA's mark INTERNATIONAL ELECTRICAL CODE.  I do note, however, that a party is only excused from its contractual promises if there is an *uncured material* failure to perform by the other party.  G.M. Abodeely Ins. Agency, Inc. v. Commerce Ins. Co., 41 Mass.App.Ct. 274, 278 (1996) citing Restatement (Second) of Contracts § 237 (1981) (emphasis supplied).

## C. NFPA's DAMAGES

NFPA seeks damages because "[i]njunctive relief, standing alone, will not suffice to make NFPA whole."  NFPA concedes that my finding that ICC's unauthorized use of INTERNATIONAL ELECTRICAL CODE amounts to trademark infringement and breach of the 1999 Settlement Agreement does not necessarily entitle NFPA to an award of damages under either theory.  Something more is required.  Aktiebolaget Electrolux v. Armatron International,

<u>Inc.</u>, 999 F.2d 1, 5 (1st Cir. 1993).  <u>See</u> <u>also</u> <u>Schutt Mfg. Co. v.</u>

<u>Riddell, Inc.</u>, 673 F.2d 202, 206 (7th Cir. 1982)(While a showing

of a likelihood of confusion will suffice to support liability

and the grant of injunctive relief, "[a] higher standard of proof

is required for the grant of money damages.") ICC argues that

NFPA has not provided sufficient admissible evidence creating a

genuine issue as to the availability of damages as to its use of

INTERNATIONAL CODE COUNCIL ELECTRICAL CODE, ICC ELECTRICAL CODE,

and INTERNATIONAL ELECTRICAL CODE.

According to the relevant section of the Lanham Act, a

successful plaintiff "shall be entitled, ... subject to the

principles of equity, to recover":

> (1) defendant's profits, (2) any damages sustained by the
> plaintiff, and (3) the costs of the action.

15 U.S.C. § 1117(a).  "If the court shall find that the amount of

the recovery based on profits is either inadequate or excessive

the court may in its discretion enter judgment for such sum as

the court shall find to be just, according to the circumstances

of the case. Such sum ... shall constitute compensation and not a

penalty." 15 U.S.C. § 1117(a).[23]  To implement these statutory

---

[23] 15 U.S.C. § 1117(a) also provides that "[i]n assessing
damages the court may enter judgment, according to the
circumstances of the case, for any sum above the amount found as
actual damages, not exceeding three times such amount," and that
"[t]he court in exceptional cases may award reasonable attorney
fees to the prevailing party."  15 U.S.C. 1117(b) further
provides that "[i]n assessing damages under subsection (a) of
this section, the court shall, unless the court finds extenuating
circumstances, enter judgment for three times such profits or

directives, the First Circuit has adopted the following four

rules, summarizing the additional showings required to secure an

award of damages under the Lanham Act.

> 1) a plaintiff seeking damages must prove actual harm,
> such as the diversion of sales to the defendant; 2) a
> plaintiff seeking an accounting of defendant's profits
> must show that the products directly compete, such that
> defendant's profits would have gone to plaintiff if there
> was no violation; 3) the general rule of direct
> competition is loosened if the defendant acted
> fraudulently or palmed off inferior goods, such that
> actual harm is presumed; and 4) where defendant's
> inequitable conduct warrants bypassing the usual rule of
> actual harm, damages may be assessed on an unjust
> enrichment or deterrence theory.

Aktiebolaget Electrolux, 999 F.2d at 5.

Because "[t]rademark remedies are guided by tort law

principles," damages need only be established with "reasonable

certainty."  Lindy Pen Co., Inc. v. Bic Pen Corp., 982 F.2d 1400,

1407 (9th Cir. 1993) citing 2 J.T. McCarthy, Trademarks and

Unfair Competition § 30:27, at 511 (2d ed. 1984).  Compare

Thompson v. Haynes, 305 F.3d 1369, 1382 (Fed. Cir. 2002) citing,

---

damages, whichever is greater, together with a reasonable
attorney's fee, in the case of any violation of section
1114(1)(a) of this title ... that consists of intentionally using
a mark or designation, knowing such mark or designation is a
counterfeit mark (as defined in section 1116(d) of this title),
in connection with the sale, offering for sale, or distribution
of goods or services."
     NFPA alleged in the Complaint that ICC's trademark
infringement and false designation of origin was willful and
intentional, making this case "exceptional" within the meaning of
§ 35 of the Lanham Act.  In the Prayer for Relief section, NFPA
again requested that "this case be declared exceptional" and that
the "damages be trebled under § 35 of the Lanham Act in view of
the willful and deliberate acts described herein."  The parties
have not addressed this request and I do not reach it.

among others, Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563-64 (1931) and Montreal Trading Ltd. v. Amax Inc., 661 F.2d 864, 868 n. 1 (10th Cir. 1981)("[T]he fact of damages ... must be established with at least reasonable certainty," but "the amount of damages ... may be estimated, provided it is not merely speculative.") "Although uncertainty created by wrongful acts does not insulate the wrongdoer from liability," Zazú Designs v. L'Oréal, S.A., 979 F.2d 499, 505 (7th Cir. 1992), and in fact the wrongdoer ought to bear the burden of uncertainty, Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., 561 F.2d 1365, 1374 (10th Cir. 1977) citing Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 265 (1946), plaintiffs "who want damages have to prove them, using methodologies that need not be intellectually sophisticated but must not insult the intelligence."  Zazú, 979 F.2d at 505 quoting Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410, 415 (7th Cir. 1992).

As with damages for trademark violations, contract law "[d]amages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty." Restatement (Second) of Contracts § 352 (1981).  The injured party only has a right to damages compensating for incidental or consequential losses actually suffered that were "caused by the breach."  Restatement (Second) of Contracts § 347, comment c (1981).  See also Augat v. Aegis, Inc., 417 Mass. 484, (1994) quoting Lowrie v. Castle, 225 Mass. 37, 51 (1916)(Damages in the

form of "[p]rospective profits may be recovered ... when the loss of them appears to have been the direct result of the wrong complained of and when they are capable of proof to a reasonable degree of certainty.")

NFPA contends that it has suffered actual damages, including lost royalties, the loss of its goodwill, and the diminution of the strength and value of its INTERNATIONAL ELECTRICAL CODE® mark.  NFPA also claims that it will incur corrective advertising costs in order to dispel confusion and rehabilitate NFPA's mark and that ICC has been unjustly enriched by its infringement. Challenging these assertions, ICC has moved for summary judgment on the issues of damages and unjust enrichment claiming that "NFPA cannot establish that it has suffered any ascertainable monetary damages or show unjust enrichment."  I consider each of the claimed elements of monetary relief in turn.

a. Lost Sales: NFPA does not claim to have lost any sales as a result of ICC's unauthorized use of INTERNATIONAL ELECTRICAL CODE in certain publications, or even as a result of ICC's use of INTERNATIONAL CODE COUNCIL (ICC) ELECTRICAL CODE.  NFPA's damages expert, Phillip Beutel, stated that "NFPA is unlikely to have lost sales of its National Electrical Code as a result of ICC's alleged infringement."  In fact, NFPA's associate general counsel Maureen Brodoff testified that while NFPA's loss "would include the loss of any profits associated with the sale of its goods and services," she is not aware of any documents indicating the

amount of any lost revenue.  Thus, NFPA cannot establish that it suffered any harm in the form of lost sales or profit.

b. Accounting of Profits: In its Complaint, NFPA claims that it "has sustained and will continue to sustain loss of value of its business and associated good will, and other monetary damages in an amount which is presently indeterminable."  In NFPA's Opposition to ICC's motion for partial summary judgment on the issues of damages and unjust enrichment, NFPA claims to have "proffered evidence of actual harm to its business in the form of loss of its good will."  This proffer was not made to show NFPA is entitled to damages in the amount of the loss to its goodwill. Rather, NFPA suggests that it is entitled to compensatory damages in an amount equal to loss of royalties and the cost of corrective advertizing because it has suffered loss to its goodwill.  See Trovan, Ltd. v. Pfizer, Inc., CV-98-00094, 2000 WL 709149, *9-12 (C.D. Cal. May 24, 2000).  NFPA also seeks an accounting of the Defendant's profits, a remedy which is intended to be a "proxy for the detriment suffered by" the plaintiff. Tamko Roofing Products, Inc. v. Ideal Roofing Co., 282 F.3d 23, 37 (1st Cir. 2002).

It is true that "[i]n addition to its own loss of profits, a plaintiff may, for example, suffer harm to the goodwill associated with its mark."  Tamko Roofing, 282 F.3d at 37; Beacon Mutual, 376 F.3d at 15.  I find that there is a genuine issue of material fact as to whether NFPA suffered actual harm to its

-64-

goodwill associated with its INTERNATIONAL ELECTRICAL CODE mark.

"The measure of damage to business property, such as good will, is based on the measurement of the difference in value of the property before and after the injury.  Factors to be considered in determining the loss of good will are the length of time the business has been in existence, its average profits, its success, and the likelihood of its continuing business under the same name."  38 Am. Jur. 2d Good Will § 28 (2005).  One Appellate Court has held that "[l]oss of goodwill should be proven by detailed business records before and after the breach, as well as testimony by those who have first-hand knowledge of such loss. ... Where loss of goodwill is not adequately proven by expert testimony, the trial court should not allow the jury to speculate as to what those damages would be and should direct a verdict against any damages for goodwill."  Kinetico, Inc. v. Independent Ohio Nail Co., 19 Ohio App.3d 26, 31-32 (1984) cited in 38 Am. Jur. 2d Good Will § 28 (2005).

While not subscribing to a rule requiring expert testimony to prove harm to a plaintiff's goodwill, I note that NFPA has failed to provide any business records or other evidence supporting Brodoff's "self-serving declaration that such a loss was sustained."  Kinetico, 19 Ohio App.3d at 31; see Brodoff's Testimony, pp. 63-71.  In fact when ICC's counsel asked Brodoff, who according to ICC was NFPA's only 30(b)(6) designee on the issue of damages allegedly sustained by NFPA to its goodwill and

reputation, "what is the amount of the loss that NFPA has sustained to the value of its business," NFPA counsel objected, stating that NFPA will "be designating an expert to speak to this issue and Miss Brodoff isn't prepared to speak to how goodwill and reputation, loss of value of business is quantified."  But NFPA never designated an expert to speak about any loss of goodwill and Beutel, NFPA's damages expert, did not make any reference to loss of goodwill in his report or in the excerpt of his deposition provided in support of ICC's motion for partial summary judgment.  NFPA has, therefore, failed to prove actual harm to its goodwill and reputation.

I recognize, however, that the question is before me on a summary judgment motion and direct evidence is not required to establish harm to goodwill on summary judgment.  Beacon Mutual, 376 F.3d at 15, 17 (discussing the plaintiff's burden in opposing summary judgment as to *liability* under the Lanham Act where the defendant argued the plaintiff had not produced evidence of actual confusion, that is evidence specifically demonstrating that the confusion "'could inflict commercial injury in the form of ... a diversion of sales, damage to goodwill, or loss of control over reputation' on the trademark holder").  See also Quabaug Rubber Co. v. Fabiano Shoe Co., 567 F.2d 154, 161 (1st Cir. 1997)("A precise showing [of actual harm to the plaintiff's business] is not required, and a diversion of sales, for example,

would suffice.") "[T]he conventional rule that a plaintiff may amass a preponderance of the evidence through direct or circumstantial evidence" should also apply to a plaintiff opposing summary judgment as to damages.  Beacon Mutual, 376 F.3d at 17.

NFPA contends that its "name and mark have come to be linked with ICC's inferior ICC Publication -- a text that does not comply with the stringent code standards to which NFPA adheres; was not subjected to any comment and review from its membership; contains technical provisions directly at odds with the National Electrical Code®; and is not an electrical code even though it deceptively claims to be an electrical code."[24] Consequently, NFPA suggests that ICC's conduct in using "words describing the Publication that not only misidentify the product, but that also create a false association with the National Electrical Code® ... has damaged NFPA's reputation and has eroded its goodwill."

Drawing all reasonable inferences in favor of NFPA, I find that there is a triable issue as to whether any confusion caused by ICC's use of any of the three marks lessened NFPA's goodwill and reputation associated with the INTERNATIONAL ELECTRICAL CODE mark.  Although there is little more than a self-serving assertion by NFPA's Assistant Vice President and Chief Electrical

---

[24] In ICC's Response to NFPA's Statement of Additional Facts, ICC objects to many of the characterizations included in this statement.

Engineer that the provisions in Chapter 12 of ICC's publications "are inferior to the similar NEC® provisions in that ICC's provisions have not gone through the rigorous and independent process of code review" and a letter from Stauffer on behalf of the National Electrical Contractors Association, whose policy it is to support the NEC® as the uniform national rules for safe wiring, to ICC requesting "the withdrawal of [ICC's] incomplete and confusing 'administrative' document that includes technical provisions conflicting with those of the NEC," proof of the inferiority of the infringing product is not required for a Court to infer harm to the trademark holder's goodwill. See Beacon Mutual, 376 F.3d at 16 ("[N]othing in the statute suggests that demonstrable harm to plaintiff's goodwill and reputation resulting from confusion of marks is restricted to th[e] classic situation" where the defendant's product is inferior.)

As indicated above, NFPA seeks an accounting of the defendant's profits, which is a remedy that is intended to be a "proxy for the detriment suffered by" the plaintiff.  Tamko Roofing, 282 F.3d at 37.  Although there is no evidence here from which a jury could find that ICC's unauthorized use of NFPA's mark was willful and amounted to fraud or palming off inferior goods, such that actual harm is presumed, there is sufficient evidence from which a reasonable jury could find that the products directly compete, despite ICC's arguments to the contrary.  Aktiebolaget Electrolux, 999 F.2d at 5.  Accordingly,

-68-

there is a triable issue as to whether NFPA is entitled to an accounting of ICC's profits on the sale of its Electrical Code Administrative Provisions as a proxy for the harm caused to NFPA's goodwill and reputation as a result of ICC's allegedly inadvertent and isolated use of INTERNATIONAL ELECTRICAL CODE, and potentially for its use of ICC ELECTRICAL CODE and INTERNATIONAL CODE COUNCIL ELECTRICAL CODE depending on the resolution of the merits.

c. Lost Royalties: NFPA's damages expert surmised that NFPA suffered a "second measure of [] economic harm" in the form of a "trademark owner's lost opportunity to negotiate a license with the alleged infringer."  NFPA argues that since it "has shown actual harm and bad faith, it should be up to the jury to assess the amount of damage suffered.  The reasonable royalty provides one measure of such damage."  Although I have found that there is a triable issue as to whether NFPA suffered damage in the form of loss of goodwill, I grant ICC's summary judgment motion as to the availability of lost royalties.

Of the courts that have allowed an award of reasonable royalties in trademark infringement cases, only the Seventh Circuit has permitted such an award without evidence of a prior licensing relationship or when the parties had not shown a willingness to license the mark.  Trovan, 2000 WL 709149 at *16; A & H Sportwear Inc. v. Victoria's Secret Stores, Inc., 166 F.3d

197, 208-09 (3rd Cir. 1999)(An award of lost royalties is made "most often for continued use of a product beyond authorization, and damages [are] measured by the license the parties had or contemplated."). The anomalous case is <u>Sands, Taylor & Wood Co. v. Quaker Oats Co.</u>, 978 F.2d 947, 963 (7th Cir. 1992), <u>remanded</u> and <u>affirmed</u>, 34 F.3d 1340 (7th Cir. 1994).

NFPA cites to <u>Sands</u> for the proposition that a reasonable royalty would be an appropriate measure of damages in these circumstances. But, like Judge Baird in <u>Trovan</u>, I do not consider the treatment of the issue in the <u>Sands</u> litigation to be compelling, given the lack of "any evidence that plaintiff[] in this case would have licensed the rights to the mark." <u>Trovan</u>, 2000 WL 709149 at *17-18. In fact, Beutel, NFPA's own expert, suggests that given "the industry in which the parties operate, ... there is little if any economic incentive for a code organization to enter into a business arrangement with another organization that could increase the likelihood that the other party could enter its markets and cause jurisdictions to switch to alternative codes." More specifically, "NFPA would be reluctant to provide ICC with intellectual property, in the form of its well-known 'International Electrical Code®' trademark, that could potentially be used to assist ICC's entry into the market." Consequently, I find that an "award of reasonable royalties has no basis in reality, much less any basis in fact. Thus, [Beutel's estimate] cannot be said to have been made 'with

-70-

reasonable certainty.'" Id. at *18 quoting Sanchez-Corea v. Bank of Am., 38 Cal.3d 892, 907 (1985).  In fact, given that Beutel believes that NFPA "would not willingly license the marks at issue to ICC for the uses to which ICC has put them - at least not for any fee of the same magnitude as the profits earned by ICC on the *ICC Electrical Provisions* itself," I find that it is utterly speculative for him to assume, even if conservatively, "that the outcome of a hypothetical negotiation between the parties would have resulted in a royalty no greater than the profits earned by the Defendants on the allegedly infringing publications."

Accordingly, I find there is no cognizable basis for an award of lost royalties and grant ICC's summary judgment as to this measure of damages.

c. Corrective Advertizing: Compensatory damages for both trademark infringement and breach of contract are intended to make the injured plaintiff whole; they are not meant to provide a windfall.  Big O, 561 F.2d at 1384; Quabaug Rubber, 567 F.2d at 161; Adray v. Adry-Mart, Inc., 76 F.3d 984, 988 (9th Cir. 1996).  In certain circumstances an award equaling the amount necessary for corrective advertizing is recoverable as a remedy where there was actual harm.  Zazú, 979 F.2d at 506; Big O, 561 F.2d at 1374-75; Adray, 76 F.3d at 988.  The award may be prospective, that is a reasonable estimation of the future costs of corrective

advertizing when the plaintiff has not yet spent any money on advertising to counteract any confusion in the industry.  Zazú, 979 F.2d at 506; Big O, 561 F.2d at 1375; Adray, 76 F.3d at 988-89.  However, the award must still satisfy the determinable-with-reasonable-certainty requirement, and "expenses for repair cannot be justified when they exceed the value of the asset."  Zazú, 979 F.2d at 506; Adray, 76 F.3d at 989 ("Prospective costs ... present a danger of overcompensation if they exceed the value of the mark.")

NFPA contends that Beutel's Expert Report and the Affidavit of Paul Crossman amount to sufficient evidence supporting its position that the cost of corrective advertising would be at lest $207,000.  I disagree and will preclude recovery based on this theory.

Rule 26(a)(1) requires disclosure of "a computation of any category of damages claimed by the disclosing party."  The parties must also make available for inspection and copying "the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including material bearing on the nature and extent of injuries." Fed. R. Civ. P. 26(a)(1).  Rule 37 provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a), ... is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed."

Fed. R. Civ. P. 37(1).

NFPA does not dispute that it "never claimed in its discovery responses, its Rule 26(a) damage disclosures, or in its 30(b)(6) witness testimony that it has ever conducted a corrective advertising campaign, or that it plans to do so." Yet, on or about January 20, 2005, after the close of fact discovery, Crossman, NFPA's Vice President of Marketing and Sales, prepared a document entitled International Electric Code Brand Advertising -- Media Schedule (estimated costs) (the Media Schedule).  This document was provided to Beutel, who appears to have completed his expert report including the corrective advertizing theory of recovery on February 1, 2005.  ICC only appears to have been provided with this document shortly before or at the deposition of Beutel on March 3, 2005.  Consequently, ICC was not aware of this theory or Crossman's January 2005 document when it deposed Crossman, who was not even designated as a witness on damages, on November 29, 2004.

There is no reason why NFPA could not have provided Crossman's calculations, let alone its theory of corrective advertizing damages, before the close of fact discovery.  ICC's inability to cross-examine Crossman within the schedule established by this court on his estimations is surely not harmless, given Beutel's blind reliance on Crossman's calculations.  NFPA has not presented any justification for its failure to follow the procedural rules.  Consequently, disregard

of Crossman's Second Affidavit and preclusion of the theory of corrective advertizing is appropriate.  See Austrian Airlines Oesterreichische Lufverkehrs Ag v. UT Finance Corp., 04 Civ. 3854RCCAJP, 2005 WL 977850 (S.D.N.Y. April 28, 2005)("This is not a case where plaintiff needed discovery from defendant to compute its currency conversion damages.  And even if plaintiff could not calculate its currency conversion damages at the time of its initial disclosure ..., there is no reason that it did not disclose its currency conversion damage theory.  The Court will not allow plaintiff ... to assert this new, additional damage theory at the eleventh hour.  Pursuant to Rules 26(a)(1)(C) and 37(c)(1), preclusion is appropriate.") Without Crossman's Affidavit, Beutel's report and testimony is nothing more than unsupported speculation.

On the basis of the evidence properly before me, therefore, I find that there is no cognizable basis for an award of corrective advertising costs as compensation for ICC's breach of contract and trademark infringement.

d. Unjust Enrichment: "Where defendant's inequitable conduct warrants bypassing the usual rule of actual harm, damages may be assessed on an unjust enrichment or deterrence theory." Aktiebolaget Electrolux, 999 F.2d at 5; Quabaug Rubber, 567 F.3d at 162 n. 15.  But under First Circuit case law, even damages granted on a deterrent or an unjust enrichment theory have never been allowed absent some form of fraud or palming off.

-74-

Aktiebolaget Electrolux, 999 F.2d at 6.  None is shown here. Consequently, I disagree with NFPA that "there are genuine issues of material fact as to ICC's conduct, which should preclude summary judgment on unjust enrichment," and I find that there is no cognizable basis for an award for unjust enrichment as compensation for ICC's breach of contract and trademark infringement.

### III. CONCLUSION

For the reasons set forth more fully above:

I GRANT summary judgment to ICC on NFPA's claim under Mass. Gen. Laws ch. 93A in Count VIII of NFPA's Complaint;

I GRANT summary judgment to NFPA as to Counts I, III and IV concerning ICC's unauthorized use of INTERNATIONAL ELECTRICAL CODE after the execution of the Settlement Agreement;

I DENY summary judgment to ICC as to all of NFPA's claims concerning ICC's use of ICC ELECTRICAL CODE and INTERNATIONAL CODE COUNCIL ELECTRICAL CODE;

I DENY summary judgment to ICC on its breach of contract counterclaim;

I DENY summary judgment to ICC on its damages motion as to the issue of an accounting of ICC's profits; and

I GRANT summary judgment to ICC on its damages motion as to the issues of corrective advertizing, lost royalties, and unjust enrichment.

/s/ Douglas P. Woodlock

_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE